504 P.2d 1278

**Edwin BALMER, Appellant,**

v.

**James GAGNON and Jane Doe Gagnon, husband and wife, Appellees.**

**No. 2 CA–CIV 1280.**

Court of Appeals of Arizona, Division 2.

Jan. 17, 1973.

Rehearing Denied Feb. 20, 1973.

Spaid, Fish, Briney & Duffield by Richard C. Briney, Tucson, for appellant.

Murphy, Vinson & Hazlett, P.C. by James M. Murphy and Carl E. Hazlett, Tucson, for appellees.

HOWARD, Judge.

This is an appeal from a judgment entered in a personal injury case wherein the trial court held a written release executed by the appellant Balmer to the appellees barred recovery.

The facts adduced at trial considered in the light most favorable to upholding the judgment of the trial court are as follows. On October 28, 1970, appellant Edwin Balmer was the driver of an automobile which collided with another vehicle being operated by appellee James Gagnon. Immediately after the accident Balmer was aware that he sustained personal injuries and sought medical treatment.

A few weeks later Balmer retained a Tucson attorney to represent him in a personal injury action against James Gagnon.

At the time of the accident Balmer carried property damage coverage as well as medical payment benefits with Allstate Insurance Company. His attorney, as a collateral and gratuitous service, sought to help him in collecting his property damage claim from Allstate. Shortly after the accident Balmer made demand upon Allstate to pay for the property damage done to his automobile. Allstate, under the subrogation provisions of its insurance contract with Balmer, then made a demand upon Utah Home Fire Insurance Company, James Gagnon's automobile insurance carrier, for

the amount of the property damage to Balmer's vehicle. Subsequent to the demand upon Utah Home Fire, one of its employees, J. H. Martin, forwarded to Allstate the following letter:

"January 8, 1971

Allstate Insurance Company
4013 East Broadway
P. O. Box 12367

Tucson, Arizona 85711

Re: Our Claim No. : 5912
Our Insured . : James P. Gagnon
D/L : 10/28/70
Your Claim No. : 24B 67253
Your Insured : Edwin A. Balmer

Gentlemen:

Attached please find Release of All Claims in the net amount of $934.18.

We ask that you (sic) insured, Edwin A. Balmer, and a representative of your Company both execute where indicated by 'X' and return to this office whereby payment can be made.

Thank you.

Very truly yours,

J. H. Martin
Manager

JHM/jr
enc. (1)"

It is undisputed that the letter from Utah Home Fire was never sent to or seen by appellant or his attorney prior to execution of the release. Enclosed with the letter of January 8, 1971, was an unexecuted Release of All Claims in the amount of $934.-18, which sum is the exact amount of Balmer's property damage, including his $100 deductible.

Upon receipt of the January 8, 1971, letter from Utah Home Fire, Allstate through its employee, Maureen Renz, forwarded to Edwin Balmer the release which had already been signed by an adjuster from Allstate Insurance Company.

The cover letter from Allstate to Balmer dated February 2, 1971, stated as follows:

" * * *

We have now made a settlement of the claim for the *collision damage* to your car. In order to complete the handling of this claim, we need your signature on the enclosed release forms.

Please sign the releases in ink where indicated and return them in the enclosed envelope as soon as possible. You will hear from us as soon as we receive payment from the other party. * * *"
(Emphasis added)

After receiving Allstate's letter dated February 2, 1971, Balmer took the release and letter to Attorney ——— ———, who is not appellant's present counsel. The attorney testified at trial as to what transpired in his office:

"Q. How did that letter [dated February 2, 1971] come to your hands, Mr. ———?

A. I believe my client brought it to me.

Q. Did he have anything else with him at that time?

A. He had a release with it, I believe.

Q. Did you have a discussion with your client concerning the release and so forth?

A. I did.

Q. What was that discussion?

A. He asked me if he ought to execute that release, and he pointed out that that covered everything, personal injury and property damage, and I told him it was okay, we were only settling property damage, and *I would take care of the excess verbiage on that release.* (Emphasis added)

Q. Had you had experience with Allstate prior to this case under similar circumstances?

A. I had had.

Q. What was the nature of those experiences?

A. Historically, with them they would have a draft or release, that would indicate that it was a release as to all matters whether it was on medical pay, or on property damage or on personal injuries.

"Oftentimes it was only a partial payment and I would call Allstate, then tell them it was only intended as a partial payment, they would always tell me, well, that's okay, just X through all and return it, or, that's okay, we understand that it's only partial payment.

Q. Had you at any time—excuse me, did you have your client sign the release?

A. I advised my client to, yes.

Q. Was that returned to Allstate?

A. It was returned to Allstate.

Q. Had you prior to that time had any conversation with the representation of the tort feasor's insurance, Utah?

A. I had not had any contact with Utah."

\*     \*     \*     \*     \*     \*

The language in the release was never corrected nor did Attorney _____ contact Allstate regarding the language of the release. No explanation of the failure to do so was given at trial.

The release was returned to Allstate who then forwarded the release to Utah Home Fire. Subsequently a draft in the sum of $934.18 was transmitted to Balmer who accepted and cashed it.

At the end of the trial the parties stipulated that Utah Home Fire never inquired of the appellant or his attorney as to whether he had been injured and also that if Utah Home Fire had had knowledge of the claim for personal injuries it would not have settled the case "piecemeal."

■ Appellant claims that Allstate was acting as the agent for Utah Home Fire, that the letter from Allstate created an ambiguity, and that neither Allstate nor appellant intended to release a claim for personal injuries, their intent being only to release the property damage claims. In effect, appellant claims a right to rescission based upon unilateral mistake induced by misrepresentation or contract ambiguity. Such mistake is a ground for avoiding a contract. McMillon v. Town of Flagstaff, 18 Ariz. 536, 164 P. 318 (1917); Heywood v. Ziol, 91 Ariz. 309, 372 P.2d 200 (1962). However, this principle is not apposite to the factual situation of this case. We have neither misleading representations nor ambiguity in the contract itself. It is quite clear that appellant read and completely understood the release. He pointed out to his attorney that if he signed it he would release *all* claims including his claim for personal injuries. His lawyer also recognized this and told appellant he would take care of the "excess verbiage". He did not do so. Thus, the real issue is whether appellant can be held for the apparent neglect of his attorney.

■■ The rules of agency apply in the attorney-client relationship. · *Cf.* Arizona Title Insurance and Trust Company v. Pace, 8 Ariz.App. 269, 445 P.2d 471 (1968). The neglect of the attorney is equivalent to the neglect of the client himself when the attorney is acting within the scope of his authority. *Cf.* Avery v. Calumet & Jerome Copper Company, 36 Ariz. 239, 284 P. 159 (1930); 7 C.J.S. Attorney & Client § 67 (1937).

■ In the case at bench, Attorney _____ had the authority to send the release to Allstate Insurance Company. However, he was supposed to correct it before transmission. His failure to do so is chargeable to the appellant.

Affirmed.

HATHAWAY, C. J., and KRUCKER, J., concur.