2000 OK 35

**STATE of Oklahoma, ex rel. OKLA-
HOMA BAR ASSOCIATION,
Complainant,**

v.

**Michael C. TAYLOR, Respondent.**

**No. SCBD–4466.**

Supreme Court of Oklahoma.

May 9, 2000.

Loraine Dillinder Farabow, Assistant General Counsel, Oklahoma Bar Association, Oklahoma City, Oklahoma for complainant.

Michael C. Taylor, pro se, Tulsa, Oklahoma, for respondent.

## BAR DISCIPLINARY PROCEEDING

### OPALA, J.

¶1 In this disciplinary proceeding against a lawyer, the issues to be decided are: (1) Does the record submitted for our examination provide sufficient evidence for a meaningful *de novo* consideration of the complaint and of its disposition?[1] and (2) Is a thirty-day suspension an appropriate disciplinary sanction for respondent's breach of professional ethics? We answer both questions in the affirmative.

### I

### INTRODUCTION TO THE RECORD

¶2 The Oklahoma Bar Association [Bar] charged Michael C. Taylor [Taylor or respondent], a licensed lawyer from Tulsa, Oklahoma, with one count of professional misconduct.[2] The parties' stipulation on file

1. The record consists of the parties' stipulation (which contains stipulated facts, agreed conclusions of law and agreed factors to be considered in mitigation of the charges), a transcript of the hearing held before the Professional Responsibility Tribunal, exhibits offered by both parties, which were admitted in evidence at that hearing, and the report of the Professional Responsibility Tribunal.

2. This bar disciplinary proceeding was commenced on 23 July 1999 by the filing of the Bar's complaint in accordance with the provisions of Rule 6 (Formal Proceedings Before the Supreme Court and Professional Responsibility Tribunal), Rules Governing Disciplinary Proceedings, 5 O.S.1991, Ch. 1, App. 1–A. The pertinent terms of RGDP Rule 6.1 are:

> ... The proceeding shall be initiated by a formal complaint prepared by the General Counsel, approved by the Commission, signed by the chairman or vice-chairman of the Commission, and filed with the Chief Justice of the Supreme Court ...

The Bar's July 23 complaint charged respondent with violating ORPC Rules 1.15(b)(c), 5.3, 8.1(b),

consists of stipulated facts, conclusions of law and agreed factors to be considered in mitigation of the discipline to be imposed. Left unresolved was the discipline to be recommended. Respondent admitted to having vi-

and 8.4(a)(c), 5 O.S.1991, Ch. 1, App. 3–A. and RGDP Rules 1.3, 1.4 and 5.2, 5 O.S.1991, Ch. 1, App. 1–A. At the PRT hearing the Bar withdrew the allegation of misconduct under RGDP Rule 1.4 (Monetary Transactions).

3. The terms of **Rule 1.15(b)** and **(c)**, Oklahoma Rules of Professional Conduct, 5 O.S.1991, Ch. 1, App. 3–A, (Safekeeping Property), are:

(b) *Upon receiving funds or other property in which a* client or *third person has an interest,* a lawyer *shall promptly notify the* client or *third person.* Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer *shall promptly deliver to the* client or *third person* any funds or other property that the client or third person is entitled to receive and, *upon request by the* client or *third person, shall promptly render a full accounting regarding such property.*
(c) When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, *the property shall be kept separate by the lawyer until there is an accounting and severance of their interests.* If a *dispute arises* concerning their respective interests, *the portion in dispute **shall be kept separate** by the* lawyer *until the dispute is resolved.*
(emphasis supplied).

4. The terms of **Rule 5.3**, Oklahoma Rules of Professional Conduct, 5 O.S.1991, Ch. 1, App. 3–A,(Responsibilities Regarding Nonlawyer Assistants), are:

With respect to a nonlawyer employed or retained by or associated with a lawyer:
(a) a partner in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer;
(b) *a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer;* and
(c) a lawyer *shall be responsible for conduct of such a person* that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if:
(1) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or
(2) the lawyer is a partner in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.
(emphasis supplied).

olated Rules 1.15(b)(c),[3] 5.3,[4] 8.1(b),[5] and 8.4(a)(c),[6] Oklahoma Rules of Professional Conduct [ORPC] and Rules 1.3[7] and 5.2,[8] Rules Governing Disciplinary Proceedings [RGDP]. At the end of the hearing, the Pro-

5. The terms of **Rule 8.1(b)**, Oklahoma Rules of Professional Conduct, 5 O.S.1991, Ch. 1, App. 3–A, (Bar Admission and Disciplinary Matters), states:

An applicant for admission to the bar, or *a lawyer* in connection with a bar admission application or *in connection with a disciplinary matter,* shall not:

* * *

(b) *fail to disclose a fact necessary to correct a misapprehension* known by the person to have arisen in the matter, or *knowingly fail to respond to a lawful demand for information* from an admissions or disciplinary authority, except that this rule does not require disclosure of information otherwise protected by Rule 1.6.
(emphasis supplied).

6. The pertinent terms of **Rule 8.4(a)** and **(c)**, Oklahoma Rules of Professional Conduct, 5 O.S. 1991, Ch. 1, App. 3–A, (Misconduct), are:

It is professional misconduct for a lawyer to:
(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another; . . .

* * *

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

7. The terms of **Rule 1.3**, Rules Governing Disciplinary Proceedings, 5 O.S.1991 Ch. 1., App. 1–A, (Discipline for Acts Contrary to Prescribed Standards of Conduct), are:

The commission by any lawyer of any act contrary to prescribed standards of conduct, whether in the course of his professional capacity, or otherwise, which act would reasonably be found to bring discredit upon the legal profession, shall be grounds for disciplinary action. . . .

8. The terms of **Rule 5.2**, Rules Governing Disciplinary Proceedings, 5 O.S.1991 Ch. 1., App. 1–A, (Investigations), are:

After making such preliminary investigation as the General Counsel may deem appropriate, the General Counsel shall . . . (2) file and serve a copy of the grievance . . . upon the lawyer, who shall thereafter make a written response which contains a full and fair disclosure of all the facts and circumstances pertaining to the respondent lawyer's alleged misconduct . . . The *failure of a lawyer to answer within twenty (20) days after service of the grievance . . . shall be grounds for discipline . . .*
(emphasis supplied).

fessional Responsibility Tribunal [PRT or trial panel] directed the parties to offer a brief suggesting the discipline to be visited.

¶ 3 Following receipt of the parties' briefs and upon consideration of the stipulations and testimony on file the trial panel issued a report with its findings of fact and conclusions of law together with a recommendation for discipline. In accord with the parties' stipulations, the trial panel found that Taylor had violated ORPC Rules 1.15(b)(c), 5.3, 8.1(b), and 8.4(a)(c), and RGDP Rules 1.3 and 5.2. *It recommended that Taylor be publicly censured and that he bear the costs of the proceedings.*

## II

## THE RECORD BEFORE THE COURT PROVIDES SUFFICIENT EVIDENCE FOR A MEANINGFUL *DE NOVO* CONSIDERATION OF ALL FACTS RELEVANT TO THIS PROCEEDING

■■■■ ¶ 4 In a bar disciplinary proceeding this court functions *in an adjudicative capacity* as a licensing organ of the State vested with exclusive original jurisdiction.[9] Its authority rests on the constitutionally invested nondelegable power to regulate the practice of law, which includes the ethics, licensure, and discipline of legal practitioners in this state.[10] Before deciding whether discipline is warranted and what sanction, if any, is to be imposed for the misconduct charged, this court conducts a nondeferential, full-scale, *de novo* examination of all relevant facts,[11] in the consideration of which the recommendations of the trial panel are neither binding nor persuasive.[12] We are not guided here by the standard-of-review criteria applicable in the context of corrective process on appeal or on certiorari. In the latter categories we may be compelled by the law's mandated deference to leave undisturbed another tribunal's findings of fact.[13]

■■■■ ¶ 5 This court can discharge its duty only if the trial panel submits a complete record of the proceedings.[14] Our initial task is to ascertain whether the materials are sufficient to permit (a) an independent determination of the critical facts and (b) the crafting of an appropriate measure of discipline. The latter task is to be guided by (1)

9. *State ex rel. Okl. Bar Ass'n v. Leigh,* 1996 OK 37, ¶ 11, 914 P.2d 661, 666; *State ex rel. Okl. Bar Ass'n v. Eakin,* 1995 OK 106, ¶ 8, 914 P.2d 644, 647; *State ex rel. Okl. Bar Ass'n v. Bolton,* 1994 OK 53, ¶ 15, 880 P.2d 339, 344; *State ex rel. Okl. Bar Ass'n v. Donnelly,* 1992 OK 164, ¶ 11, 848 P.2d 543, 545; *State ex rel. Okl. Bar Ass'n v. Raskin,* 1982 OK 39, ¶ 11, 642 P.2d 262, 265; *In re Integration of State Bar of Oklahoma,* 1939 OK 378, 185 Okl. 505, 95 P.2d 113, 115.

10. *Eakin, supra* note 9, at ¶ 8, at 648; *State ex rel. Okl. Bar Ass'n v. Downing,* 1990 OK 102, ¶ 12, 804 P.2d 1120, 1122–1123; *Raskin, supra* note 9, at ¶ 11, at 265–266.

11. *Leigh, supra* note 9, at ¶ 11, at 666; *Eakin, supra* note 9, at ¶ 8, at 647–648; *State ex rel. Okl. Bar Ass'n v. Lloyd,* 1990 OK 14, ¶ 8, 787 P.2d 855, 858; *State ex rel. Okl. Bar Ass'n v. Stubblefield,* 1988 OK 141, ¶ 7, 766 P.2d 979, 982; *State ex rel. Okl. Bar Ass'n v. Cantrell,* 1987 OK 17, ¶ 1, 734 P.2d 1292, 1293; *State ex rel. Okl. Bar Ass'n v. Brandon,* 1969 OK 28, ¶ 5, 450 P.2d 824, 827. Because this court's cognizance of disciplinary proceedings cannot be shared with any other institution, every aspect of the Bar's adjudicative process must be revisited by our *de novo* consideration. This attribute of nondelegable jurisdiction serves to distinguish the conduct of bar disciplinary functions from trial *de novo*—a retrial in a different court—or even from *de novo* appellate review on the record, which stands for

an independent, non-deferential examination of another tribunal's record.

12. *Eakin, supra* note 9 at ¶ 8, at 648; *Raskin, supra* note 9 at ¶ 11, at 265. The court's range of options in a disciplinary proceeding is· set forth in RGDP Rule 6.15(a). Its terms provide:

(a) The Supreme Court may approve the Trial Panel's findings of fact or make its own independent findings, impose discipline, dismiss the proceedings or take such other action as it deems appropriate.

13. *Eakin, supra* note 9 at ¶ 9, at 648; *Bolton, supra* note 9 at ¶ 16, at 345; *State ex rel. Okl. Bar Ass'n v. Perceful,* 1990 OK 72, ¶ 5, 796 P.2d 627, 630.

14. The terms of RGDP Rule 6.13 provide in part:

Within thirty (30) days after the conclusion of the hearing, the Trial Panel shall file with the Clerk of the Supreme Court a written report which shall contain the Trial Panel's findings of fact on all pertinent issues and conclusions of law (including a recommendation as to discipline, if such is found to be indicated, and a recommendation as to whether the costs of the investigation, record and proceedings should be imposed on the respondent), and shall be accompanied by all pleadings, a transcript of the proceeding, and all exhibits offered....

what is consistent with the discipline imposed upon other lawyers who have committed similar acts of professional misconduct and (2) what discipline avoids the vice of visiting disparate treatment on the respondent-lawyer.[15]

 ¶ 6 Taylor has admitted, and the proof supports, the charge of professional misconduct. Upon consideration of the record, we conclude that its contents are adequate for this court's *de novo* consideration of respondent's professional misconduct.

## III

### THE CHARGES LODGED AGAINST THE RESPONDENT

¶ 7 The alleged misconduct occurred during respondent's representation of Shelby Deason and her two minor children [Deason or client], who were injured on 6 May 1998 in an automobile accident. From May through August of 1998 the Deasons received medical treatment from Dr. Gregg Alan Coker. On August 19 he sent to Prudential Insurance a final billing statement for his services in the amount of $890. Respondent settled the case with the insurer for $911.75.

¶ 8 On 2 November 1998 Prudential Insurance sent to Taylor *three checks* made *payable to Dr. Coker, Taylor, and Deason* totaling $911.75. Respondent did not notify Dr. Coker about the settlement checks. Instead, on November 9 respondent's employee (and wife), Mrs. Taylor, endorsed the names of Dr. Coker, Taylor, and that of the client on the three checks and deposited them in his trust account. Dr. Coker's name was signed without his knowledge or consent.

¶ 9 Dr. Coker's office manager (and wife), Kat Coker, would testify that on 10 December 1998 she was advised by Prudential Insurance that the Deason case had been settled and that payment had been sent to respondent. Mrs. Coker called respondent's office the same day to find out the status of the settlement check. She was informed by a temporary employee in respondent's office that they were waiting for Deason to sign the release. On 5 January 1999 she was again

advised by the same employee that they were waiting on the client's signature before the funds could be disbursed.

¶ 10 Mrs. Coker's January 6 letter to Deason informed her that (a) respondent had been holding the settlement check for two months and that the physician's office had not been paid, (b) that respondent's employee told her they were trying to obtain her signature on the release so that funds could be disbursed, (c) and that unless Dr. Coker received full payment on January 20, a small claims action would be filed against Deason. A copy of the letter was sent to respondent. *Two days later*, Dr. Coker's office received an undated letter from respondent along with a check *dated 9 November 1998* drawn on his trust account for $586.83 with a notation "part. pay Deason family." Respondent's letter neither addressed the two-month delay in sending payment nor explained how the settlement checks were negotiated without Dr. Coker's signature.

¶ 11 Mrs. Coker would testify that after checking with Prudential Insurance and determining that Dr. Coker was shown as a payee on the checks, she wrote (a) "VOID—NOT ACCEPTABLE" on respondent's letter and (b) "VOID" across the front of the respondent's check and returned both items to the latter. She again advised Deason that partial payment was not acceptable. On January 20 Dr. Coker received from Prudential Insurance copies of the negotiated settlement checks, discovering that *three checks*, not one, had been issued. The copies showed the endorsement of the payees' names on the back of the checks. Later that day Mrs. Coker called respondent's office and left a message that unless full·payment was received by the end of the day, a complaint would be filed against him. Respondent did not comply with her demand.

¶ 12 On January 27 the Bar received from Dr. Coker a written grievance alleging (a) respondent *failed to notify* him upon receipt of settlement funds, (b) his office *misrepresented* the status of funds' disbursement, and (c) he *forged* Dr. Coker's signature on the settlement checks. The Bar advised the re-

**15.** *Eakin, supra* note 9 at ¶ 9, at 648; *Bolton, supra* note 9 at ¶ 16, at 345; *Perceful, supra* note 13 at ¶ 5, at 630.

spondent by letter dated February 11 that a formal investigation had commenced and that he had 20 days to respond. When respondent did not timely answer, the Bar sent on March 15 a certified letter, informing him that failure to respond within five days would result in the issuance of a subpoena. In a *letter to the Bar, dated March 15* but received March 17, respondent denied any wrongdoing, but failed, though he had been requested so to do, to address the applicability to his actions of ORPC Rules 1.15 and 8.1(a)(b)(c) and of RGDP Rule 1.4.

¶ 13 In a *March 15 letter* to Dr. Coker, respondent tendered another check for $586.83 drawn on his trust account, stating that the amount represents the "net remainder." of the settlement proceeds. His letter explained that because an attorney's lien is superior to that by a physician, it was not "unlawful, unethical nor improper" to deposit the settlement check in the trust account and to pay the "appropriate and lawful costs and fees" due in the case.[16] The letter did not explain (a) *respondent's failure* to send the November 9th check until some two months later, (b) the *misrepresentations* made by respondent's office regarding the status of the settlement distributions and (b) *why* Dr. Coker's *signatures were placed* on the back of the three checks without his authorization.

¶ 14 Respondent's *June 21 letter* to the Bar advised that he made four disbursements from the settlement proceeds for (a) an attorney's (referral) fee to Mark Harper ($101.97), (b) his counsel fee ($203.95), (c) costs (25.00) and (d) then "sent 100% of the remainder to Dr. Coker's office *on the same day*" ($586.83), referring to November 9, the day that respondent's checks were written and deposited to his operating account. In response to the Bar's query about the different signature styles on the back of the checks, respondent explained that because his bank would become concerned if all the endorsements on the checks appeared to be in the same handwriting, he avoided the

problem by "altering the handwriting styles." This was done, he explained, not to perpetrate any fraud but merely to facilitate getting the funds deposited and then placed in the hands of the clients and medical providers. Respondent's letter *failed to advise* the Bar that although four checks were written on November 9, respondent's checks for attorney's fee and costs were deposited that day, but the checks to Dr. Coker and Harper *were mailed some two months later.* The letter also *misrepresented* to the Bar that these checks were sent the "same day" the respondent's check was deposited. According to respondent, the checks were being held until the settlement releases were either signed or authorized by his client.

¶ 15 Although respondent's letters to the Bar and to Dr. Coker disclaimed any wrongdoing in his handling of the settlement checks, *he later stipulated that he had a duty* (a) promptly to notify all interested parties that the funds had been received, (b) to obtain in writing the permission of all co-payees to endorse the checks and deposit them in his trust account, and (c) that if a dispute arose concerning their respective interests, to keep separate all funds until that dispute has been resolved.

## IV

### MISHANDLING OF FUNDS BELONGING TO A THIRD PARTY

¶ 16 The Bar has charged respondent with improperly managing the funds entrusted to him in violation of ORPC Rule 1.15(b) and (c).[17] Rule 1.15 requires that lawyers who are entrusted with the property of clients and of third parties must hold that property with the care required of a "professional fiduciary."[18] The basis for the rule is the lawyer's fiduciary obligation to safeguard trust property and to segregate it from the lawyer's own property, and not to benefit personally from its possession.[19] Upon re-

---

**16.** Respondent had a contingency-fee contract with Deason, dated 9 May 1998, which entitled him to a 33–1/3% attorney's fee of "any and all amounts recovered *BEFORE* filing suit." (emphasis in original). His claimed attorney's lien is based on this contractual arrangement.

**17.** For the pertinent terms of Rule 1.15(b) and (c), see *supra* note 3.

**18.** Comment to Rule 1.15, Oklahoma Rules of Professional Conduct, 5 O.S.1991, Ch. 1, App. 3–A.

**19.** *Id.* The Comment (Rule 1.15) *supra* note 18, also states:

Third parties, such as client's creditors, may have just claims against funds or other proper-

ceiving funds in which a client (or third party) has an interest, a lawyer is required by ORPC Rule 1.15(b)[20] to notify promptly the interested party.[21] This notification allows the client (or third party) (a) the opportunity *for an accounting* and, if necessary, (b) the opportunity *to dispute the respective interests* before disbursement is made of the funds. Rule 1.15(c)[22] requires an attorney to keep separate a client's (or third party's) funds in which the lawyer also has an interest until a proper accounting and severance of interests can be made or until *any dispute over the quantum of interests is resolved.*[23]

¶ 17 We employ three different culpability standards when evaluating mishandling of client funds:[24] 1) *commingling*, which takes place when client money is intermixed with the attorney's personal funds; 2) *simple conversion*, which occurs when a lawyer applies a client's money to a purpose other than that for which it was entrusted to the attorney and 3) *misappropriation*, the most serious infraction, which involves an act of conversion (or similar wrongful taking) when an attorney purposefully deprives a client of money by way of deceit and fraud.[25] Complete separation of a client's money from that of the lawyer is the only way in which proper accounting can be maintained.[26] The gravity of culpability in mishandling of funds ascends from the first to the last of the three categories. Each must be proved by clear and convincing evidence.[27] *A lawyer's mishandling of funds belonging to a third party is not to be treated differently from the approach we take to commingling, misappropriation or conversion of funds belonging to the lawyer's client.*[28] In each case, the law-

ty in a lawyer's custody. *A lawyer may have a duty under applicable law to protect such third-party claims against wrongful interference by the client, and accordingly may refuse to surrender the property to the client.* However, a lawyer should not unilaterally assume to arbitrate a dispute between the client and the third party.
(emphasis supplied).

20. For the pertinent terms of Rule 1.15(b), see *supra* note 3.

21. *State ex rel. Okl. Bar Ass'n v. Brown*, 1998 OK 123, ¶ 9, 990 P.2d 840, 842.

22. For the pertinent terms of Rule 1.15(c), see *supra* note 3.

23. *State ex rel. Okl. Bar Ass'n v. Williams*, 1995 OK 130, ¶ 12, 911 P.2d 905, 907; *State ex rel. Okl. Bar Ass'n v. Cummings*, 1993 OK 127, ¶ 25, 863 P.2d 1164, 1173 n. 48.

24. These standards were set out in *State ex rel. Okl. Bar Ass'n v. Johnston*, 1993 OK 91, ¶ 21, 863 P.2d 1136, 1144; *Cummings, supra* note 23 at ¶ 23, at 1172.

25. A lawyer found guilty of intentionally inflicting grave economic harm by mishandling clients' funds is deemed to have committed the most grievous degree of offense. *Donnelly, supra* note 9 at 548. A finding that the attorney did so intentionally, regardless of exceptional mitigation factors, *(Raskin, supra* note 9), mandates the imposition of harsh discipline—that of disbarment. *See* RGDP Rule 1.4(c), Rules Governing Disciplinary Proceedings, 5 O.S.Supp.1992, Ch. 1, App. 1-A.; *State ex rel. Okl. Bar Assn. v.*

*Miskovsky*, 1991 OK 88, ¶ 41, 824 P.2d 1090, 1101 n. 19.

26. The attorney has exclusive domain over the management of entrusted funds. Keeping a client's (or third party's) money separate and distinct ensures that the money is at *all* times properly accounted for and can be shown to be distinct. This serves to prevent a lawyer from *deliberately* or *mistakenly* using any of the entrusted funds. "In their daily work lawyers commonly come into clients' funds. The trust placed in the lawyer owes its origin to the special professional status he occupies as a licensed practitioner. Public confidence in the practitioner is essential to the proper functioning of the profession. Few breaches of ethics are as serious as the act of commingling a client's [or third party's] funds and the unwarranted use of his money." *Raskin, supra* note 9 at ¶ 14, at 267; *Cummings, supra* note 23 at ¶ 24, at 1172; *Johnston, supra* note 24 at ¶ 22, at 1145 n. 36.

27. The terms of Rule 6.12(c), Rules Governing Disciplinary Proceedings, 5 O.S.1991, Ch.1, App.1-A, are:
(c) To warrant a finding against the respondent in a contested case, the charge or charges must be established by clear and convincing evidence,....

28. See in this connection *State ex rel. Okl. Bar Assn. v. Stutsman*, 1999 OK 62, ¶ 12, 990 P.2d 854, 860 (a lawyer's mishandling of funds belonging to a law firm, where that lawyer is employed, is not to be treated differently from misappropriation or conversion of funds belonging to the lawyer's client); *Matter of Disciplinary Proceedings Against Olson*, 216 Wis.2d 483, 484-85, 574 N.W.2d 245 (1998) (a lawyer's professional misconduct in using funds of his law firm for personal purposes warranted a one-year suspension); *Matter of Disciplinary Proceedings*

yer violates the basic professional duty of trust, not only as counsel but also as fiduciary.[29]

¶ 18 The record before us reveals that respondent (a) *received* three checks payable to Dr. Coker, respondent and to the client in November 1998; (b) *failed* to notify Dr. Coker of the checks until almost two months later, and (c) *gave* no legal excuse for the delay. On November 9 respondent's wife *forged* the signature of Dr. Coker on the back of the checks and *deposited* them in his trust account. On the same day he *wrote two checks* drawn on the trust account for his claimed fee and costs and *deposited* them in his operating account, (a) *without first notifying* Dr. Coker that the settlement checks had been received and (b) *without giving* Dr. Coker *an opportunity to dispute* the amount of the distribution. We find that respondent's (a) *failure to notify promptly* Dr. Coker of the receipt of the insurance checks (b) *failure to hold the funds separate* until the dispute over the respective interests in the funds (Dr. Coker's, the client's and Harper's) was resolved and (c) *misleading* (via his staff) Mrs. Coker about the distribution of the funds constituted a violation of ORPC Rule 1.15(b) and (c).

## V

## A LAWYER'S DUTY TO SUPERVISE LAY PERSONNEL

¶ 19 A lawyer is duty-bound to supervise the work done by lay personnel and stands ultimately responsible for work done by all nonlawyer staff.[30] While a law-

yer's delegation of an entrusted task to a staff person is not improper, it is the lawyer who must supervise the work that is passed on to another and exercise complete, though indirect, professional control over the actions of the employees. The work of lay personnel is done by them as agents of the lawyer employing them.[31] A lawyer who fails properly to supervise lay personnel, particularly when he has knowledge that the employee is engaging in conduct that would violate the Rules of Professional Conduct is guilty of dereliction.[32] It is the lawyer who has the ultimate responsibility to ensure that the internal processing system of his office is in compliance with his professional obligations. Within the meaning of ORPC Rule 5.3,[33] the lawyer's knowledge of the flawed conduct and failure to correct it is considered an approval of the assistant's wrongful actions. Violating the Rules of Professional Conduct through the acts of another is professional misconduct under Rule 8.4(a). Dishonesty, deceit, fraud or misrepresentation amount to professional misconduct under Rule 8.4(c).

¶ 20 *The record shows that respondent fell woefully short of his obligation to supervise his staff in the handling of a client's funds in which third parties had an interest.* Respondent admitted that his wife signed Dr. Coker's signature on the three settlement checks without the latter's authorization. Although the respondent may not have intended to defraud Dr. Coker of any money, his wife did falsely endorse the doctor's name on the settlement checks, and respondent's subsequent actions ratified this

*Against Casey*, 174 Wis.2d 341, 342, 496 N.W.2d 94, 95 (1993)(a lawyer's appropriation of the client's retainer to his own use, rather than giving it to the law firm where he is employed, is professional misconduct warranting a 60–day suspension).

29. *Stutsman, supra* note 28 at ¶ 12, at 860; *Olson, supra* note 28 at 484–85; *Casey, supra* note 28 at 95.

30. *State ex rel. Okl. Bar Ass'n v. Mayes*, 1999 OK 9, ¶ 25, 977 P.2d 1073, 1082; *Cummings, supra* note 23 at ¶ 25, at 1173; *Miskovsky, supra* note 25 at ¶ 21, at 1097; *State ex rel. Okl. Bar Ass'n v. Braswell*, 1983 OK 63, ¶ 14, 663 P.2d 1228, 1231–32.

31. Under the doctrine of respondeat superior a principal or employer is generally held liable for

those acts of an agent or employee which fall within the latter's authority. *Qui facit per alium facit per se* (the act of the employee is the act of the employer). This rule rests on the premise that, when exercising delegated authority, the employee stands under the complete control of the employer. Black's Law Dictionary at 1125 (5th ed.1979)(the acts of the agent are the acts of the principal). *See in this connection North Side State Bank v. Board of County Com'rs of Tulsa County*, 1994 OK 34, 894 P.2d 1046, 1051.

32. *Mayes, supra* note 30 at ¶ 25, at 1082; *Cummings, supra* note 23 at ¶ 25, at 1173; *Miskovsky, supra* note 25 at ¶ 21, at 1097; *Braswell, supra* note 30 at 1231–1232.

33. For the terms of ORPC Rule 5.3 see *supra* note 4.

conduct. *He stipulated that unauthorized endorsements are acts contrary to the prescribed standards of conduct.*

¶ 21 Mrs. Coker would testify that she called respondent's office to inquire about the status of the settlement check on *December 10* and again on *January 5.* On each occasion she was informed by respondent's employee that these checks were waiting for the client's signature before the funds could be disbursed and payments made to Dr. Coker. Based on this conversation, Mrs. Coker believed that respondent was holding the settlement check until the client signed the release, at which time the co-payees would endorse and negotiate the settlement check. No one in respondent's office ever advised Mrs. Coker that the three settlement checks had already been endorsed and deposited into his trust account (on November 9) and a transfer of the claimed fee and costs was made the same day from the proceeds to respondent's operating account.

 ¶ 22 It is misleading to the banking institutions for respondent and his staff to sign payees' names on the back of settlement checks and purposefully "change the handwriting styles," even if the purpose for doing so is only to facilitate the quick distribution of funds. The *correct endorsement* of a payee's name should take the form of placing a lawyer's initials (or a notation) following the endorsement of a payee's name. This would indicate that a lawyer has signed the name on behalf of that payee according to the latter's legal authorization.

¶ 23 *We hold that respondent's failure to supervise his staff and to prevent the improper endorsement of the insurance checks was a violation of ORPC Rules 5.3 and 8.4(a)(c) and RGDP Rule 1.3.*[34]

---

**34.** For the terms of Rule 1.3 see *supra* note 7.

**35.** The terms of RGDP Rule 5.2, *supra* note 8, state (1) that the failure of an attorney to answer a grievance within twenty days after service *"shall"* be grounds for discipline and (2) that the response "shall" be in writing. The word "shall" is mandatory. The language of Rule 5.2 leaves no room for interpretation regarding the proper form or time for filing a response. *See State ex rel. Okla. Bar Ass'n v. Perry,* 1997 OK 29, ¶ 33, 936 P.2d 897, 904.

## VI

## TIMELY RESPONSE

 ¶ 24 A knowing failure to respond *fully* and *timely* to the Bar's demand for information in a disciplinary proceeding is itself grounds for discipline.[35]

 ¶ 25 Respondent's reply to the Bar's *February 11 letter*—dated March 15 but not received *until March 17*—not only was written (1) *after* the twenty-day period required by RGDP Rule 5.2, but also (2) was received by the Bar *after* it had sent him a second letter dated March 15. Moreover, respondent's March 15 and June 21 letters to the Bar *failed to address* all the issues raised in the Bar's inquiry, as well as *misrepresented* that the checks payable to Dr. Coker and to Harper had been mailed the "same day" (November 9) as when the two checks were deposited in respondent's operating account.

¶ 26 Respondent's failure to answer *timely, completely* and *accurately* within twenty days after service of the grievance is a violation of ORPC Rule 8.1(b)[36] and RGDP Rule 5.2.[37]

## VII

## A THIRTY–DAY SUSPENSION IS AN APPROPRIATE SANCTION

## FOR RESPONDENT'S PROFESSIONAL MISCONDUCT

 ¶ 27 The primary purpose of disciplinary judicature is not to punish the delinquent lawyer *but to protect the public* by a thorough inquest into the respondent's continued fitness to practice law.[38] Imposition of discipline is designed to foster these aims rather than to administer a purely punitive measure for a lawyer's professional dereliction.

---

**36.** For the terms of ORPC Rule 8.1(b) see *supra* note 5.

**37.** For the terms of RGDP 5.2 see *supra* note 8.

**38.** *State ex rel. Okl. Bar Ass'n. v. Samara,* 1984 OK 32, ¶ 11, 683 P.2d 979, 983; *State ex rel. Okl. Bar Ass'n v. Wallace,* 1998 OK 65, ¶ 22, 961 P.2d 818, 826; *Bolton, supra* note 9 at ¶ 15, at 344; *Donnelly, supra* note 9, at ¶ 14, at 546; *State ex. rel. Okl. Bar Ass'n v. Colston,* 1989 OK 74, ¶ 20,

¶ 28 While the PRT and the Bar recommend that respondent be *publicly censured* (and that he defray the costs of these proceedings), respondent suggests that his misconduct warrants a less severe discipline. *He urges that we visit a private reprimand.*

## A.

### *Aggravation of Discipline*

¶ 29 It would *not be in keeping* with our stewardship of public interest to visit in this case a mild form of discipline. When respondent received the settlement checks, he became a *constructive trustee* of Dr. Coker to the extent the physician may have had a legal claim to the money in respondent's hands.[39] Respondent's breach of a fiduciary duty to Dr. Coker constitutes an aggravating factor that warrants a higher level of discipline. While the client did not join in the complaint by pressing for respondent's discipline, that aspect is without legal significance. Disciplinary judicature protects the public against lawyers whose professional misbehavior presents a risk to the served community as a whole—not just to individual clients or other complainants with standing as aggrieved persons.

¶ 30 Respondent's actions affected a third-party claim to the fund. By *failing to hold separately* funds that represent proceeds due his client as well as those of a third-party medical provider to whom the client was indebted and *by diverting* a portion of the funds to his personal account *before* any dispute could be resolved, respondent must be deemed to have *commingled* the funds he so withheld.[40] This is particularly egregious where, as here, the respondent—*without either notice* to the third-party medical provider or any opportunity for an antecedent dispute resolution—*deducts the fee quantum and costs* due him, *transfers* it to his own account, and then for two months holds up the distribution to Dr. Coker (as well as to Harper) by *misrepresenting* the status of the funds' disbursement.

¶ 31 Moreover, respondent's breach of fiduciary duty was accompanied by total lack of candor in his failure to acknowledge the wrongfulness of his actions. *He mistook the claimed superiority of his attorney's lien over that of the physician's as a license to breach the trust.*[41] In short, he failed to comprehend that, in the unfolded scenario, his fiduciary obligation included the physician

777 P.2d 920, 925; *Raskin, supra* note 9 at ¶ 17, at 267.

**39.** *Because the lawyer is his client's agent, the rules of agency govern much of the interaction of the lawyer with a client. See Balmer v. Gagnon,* 19 Ariz.App. 55, 504 P.2d 1278, 1280 (1973)(the rules of agency apply in the attorney-client relationship). *Under the law of agency an agent who receives funds for a principal, a part of which belongs to a third party, is a constructive trustee for the third party. Adams v. Adams,* 1952 OK 246, ¶ 4, 208 Okla. 378, 256 P.2d 458, 461 (to impress a property with a constructive trust there must be fraud, violation of confidence or of fiduciary relationship or acquisition of title in some other unconscionable manner); *Sandpiper North Apts., Ltd. v. American Nat'l Bank,* 1984 OK 13, ¶ 11, 680 P.2d 983, 988 (one who, though not a consensual trustee, stands nonetheless liable *qua* trustee for misapplied fiduciary funds is known in equity jurisprudence as involuntary or *de son tort* trustee). The terms—*de son tort, ex maleficio,* constructive, involuntary, implied-in-law trustee or one by operation of law—are all synonyms. *Id.* at 988 n. 10. *By this equity rule, the lawyer becomes a fiduciary for the third party. The duty owed that stranger to the attorney/client relation is breached when the lawyer fails to hold separately funds to which the third party claims an interest. See in this connection* 60 O.S.1991 § 136 (a trust may be created by operation of law); *Phillips v. Ball,* 1960 OK 145, 358 P.2d 193, 197–98 (a fiduciary, be he an attorney or not, must account for and deliver over property or money of a beneficiary, client or third party which has been entrusted to him for a particular purpose and which he was required to have held in trust); *Cobb v. Whitney,* 1926 OK 1013, 255 P. 566, 569 (some of the most important applications of the constructive trust doctrine are "[w]hen a trustee, administrator, agent, *attorney,* or other fiduciary person, without the knowledge or consent of his beneficiary ... by taking advantage of the trust reposed, and of the superiority conferred upon him by the relation ... uses the trust property for his own benefit ... and by means of such use obtains additional gains and profits, in these and all similar cases equity impresses a constructive trust upon the property ... for the benefit of the party beneficially entitled")(quoting 1 Pomeroy's Equity Jurisprudence at § 1052).

**40.** *Commingling* occurs when the client's funds are combined with the attorney's personal funds. *Cummings, supra* note 23 at 1173; *Johnston, supra* note 24 at 1144.

**41.** Acting to enforce his contingency-fee contract (*supra* note 16), respondent undertook, *unilaterally and without notice, to appropriate* his claimed interest in the client's funds that have come into his possession. By these actions respondent has completely ignored his fiduciary duty to the third-party trust beneficiary as well as

as cestui que trust [42] to the extent of the latter's interest in the recovered fund.

## B.

### Respondent's Attitudinal Pattern

¶ 32 Respondent's correspondence, with both the Bar and Dr. Coker, shows unwillingness either to admit any wrongdoing or to acknowledge the significance of his clouded actions. His *initial reaction* was to ignore the Bar's inquiry. In his first letter to the

his obligation under the bar rules to notify interested parties and to keep the funds separate *until there has been an accounting, severance of interests, and a resolution of all disputes over the funds.*

42. A trustee is a person who holds legal title to property under an express or implied agreement to apply it (and the income arising from it) to the benefit of another person who is called the beneficiary or cestui que trust. *See Easterling v. Ferris*, 1982 OK 99, ¶ 10, 651 P.2d 677, 680; *Rees v. Briscoe*, 1957 OK 174, 315 P.2d 758, syl. 3. To the cestui que trust a trustee always owes *uberrima fides. See Wallace, supra* note 38, at ¶ 22, at 826 (citing Black's Law Dictionary 1690 (Revised 4th ed.1968)), which translates *uberrima fides* as "the most abundant good faith, absolute and perfect candor or openness and honesty."

43. Respondent explained in his March 15, 1999 letter to the Bar:
... Once the settlement check came in, I simply endorsed the back of the draft with everyone's name and put it in my trust account. *I do not feel there was anything improper in this procedure.* It would only be improper if I had intended to or did keep Dr. Coker's money. What happened was that after deduction for costs and fees, I sent Dr. Coker *all* remaining monies.... I want to reiterate that I did not unlawfully, improperly or unethically deprive Dr. Coker of any monies to which he was legally entitled. * * * Simply put, unless the OBA tells me I am wrong to deposit this check in my trust account, I don't believe I've done anything wrong. Although I'm not a criminal expert, it is my understanding that in order to have committed the crime of forgery, which Dr. Coker alleges, you have to affix the name of the person named on the front of the document *with the intent of defrauding him.* In other words, merely writing his name on the back of the draft is not sufficient and *certainly not improper.* I did as I was supposed to do, I held the monies in my trust account. After deducting appropriate and lawful costs and fees, I gave him the entire remainder. * * *

44. In his March 15 letter to Dr. Coker, respondent states::

Bar respondent *denied* that his actions—in placing a co-payee's name on three checks without prior authorization and in taking out of the proceeds the fee and costs claimed to be due without giving interested third parties an opportunity to dispute and settle the amount—were in violation of any bar rules.[43] This was also the tenor of his letter to Dr. Coker.[44] His second letter to the Bar states that he is "having a hard time wondering what the fuss is all about." [45] He appears to fault Dr. Coker and his wife for pressing the

... As I'm sure you well realize, attorney's liens for services rendered are *superior* to medical liens. Therefore, it was *neither unlawful, unethical nor improper* to deposit the Farmer's settlement check into my Trust Account for the purposes of making distribution. * * * Since my lien for legal services was superior to your medical lien, I first paid the costs and fees due on this file. * * * I am again tendering you *all* the money left in my Trust Account and all which I am legally and ethically bound to forward to you, noting your medical lien.... If you wish to pursue Ms. Deason for the balance, certainly that is your option, although I believe it would be wrong to do so. She's the only one who is not making any recovery whatsoever. I believe it would be more appropriate to simply take the money tendered and write off the balance. That, of course, is your decision. Note, however, that I have not beaten you out of one cent *nor done anything remotely improper* ... * * * If you have a problem, pick up the phone and I will be happy to explain how and why I conducted myself as I did. I see this as being *totally ethical and legal.* * * * I've never hidden the truth from you nor have I ever been unwilling to discuss the matter with you or your staff. However, calling over here and threatening me for actions which were *neither unlawful nor unethical* and setting deadlines for me to either do something "or else" are not going to move me to do a thing....

(emphasis in original and supplied).

45. In his June 21 response to the Bar's June 10th letter, respondent states:
"... I'm afraid I am still having a hard time understanding what the fuss is all about. Dr. Coker could *never* have received *any* more money than he got from me as a result of this settlement.... Dr. Coker had no right to more than he got from these funds. I didn't cheat anyone nor hide anything. * * * I continue to believe *I have done nothing wrong,* and certainly I have not attempted to profit nor have I profited in any way, shape or form as a result of how this matter was handled. I fully understand the OBA wishes to protect the public from lawyers whose attempt to profit from illegal acts or other wrongdoing, but I fail to see how any member of the public was adversely affected by my actions.... Likewise,

complaint because, according to him, they have not been "cheated out of any penny they were due." In a third letter to the Bar respondent's position changed slightly from that of absolute denial of any wrongdoing to one of admitting there had been "a simple, honest mistake" *by his wife* that "should not have given rise to a formal complaint." His answer to the Bar complaint reiterates that Dr. Coker's name was endorsed on the check "inadvertently—but without any malice whatsoever." Even though respondent had not given Dr. Coker a chance to dispute the amount deducted for legal fees and costs, his answer states that neither Dr. Coker nor Harper "could have received nor had a right to receive one penny more than what they actually received." Although respondent later stipulated that he had violated the Rules Governing Professional Conduct and Rules Governing Disciplinary Proceedings, his trial brief explains that he was "not attempting to cheat Dr. Coker out of any money, but was practicing in the customary manner to which he has always practiced."

### C.

### *Mitigating Factors*

 ¶ 33 Mitigating circumstances may be considered in assessing the quantum of discipline that is appropriate.[46] Respondent's professional record reflects neither previous blemishes nor a pattern of misconduct. He has *now* acknowledged and accepted responsibility for his professional misconduct. Respondent stipulated that he neither intended *to mislead* the Bar in his responses nor wrongfully *to profit* from the forgery of Dr. Coker's signature on the settlement checks. The record shows that respondent's misconduct did not cause grave economic harm. He has implemented new procedures in his office, including the assumption of all check writing and depositing duties, the prompt notification of all payees upon receipt

of settlement funds and the introduction of a new form to be sent to medical provider/co-payees requesting their written authorization to sign settlement checks on their behalf. Following his March 15 letter, respondent has been cooperative in the investigation of the grievance.

¶ 34 The court holds that the *severity of the offense* (combined with a lack of compelling mitigating factors) nonetheless warrants a license suspension for thirty days. *Respondent's misconduct consists of six separate violations of the ORPC and two separate violations of the RGDP. The claimed superiority of respondent's attorney's lien* over that of Dr. Coker's cannot serve as a license: (1) *to place* an unauthorized endorsement of the physician's name on a check upon which the latter is co-payee; (2) *to fail to notify promptly* interested parties that funds have been received; (3) *to commingle funds* to which a third party claims an interest, (4) *to misrepresent* the disposition of a check on which the physician's name appears as co-payee; (5) *to reduce the amount* the physician claimed to be due without an explanation and justification, (6) *to submit a tardy response* to a bar grievance, and (7) *to mislead* a bar investigator. The components of this offense pose grave risk to the public image of the legal profession as composed of reputable practitioners in whom the public can place its confidence when they are in charge of funds belonging to other individuals.

 ¶ 35 *Upon de novo review,* the court concludes that there is clear and convincing evidence of respondent's violations charged in the complaint. An attorney may be disciplined by this court more severely than the PRT or the Bar have recommended.[47] This is especially true when the degree of discipline the court imposes clearly is consistent with that pronounced by decisions in like cases.[48]

---

Dr. Coker and his nut-case wife have not been cheated out of one penny they were due by my actions ..."

**46.** *Raskin, supra* note 9 at ¶ 17, at 267.

**47.** See, e.g., *State ex rel. Okl. Bar Ass'n v. Arthur,* 1999 OK 97, ¶ 16, 991 P.2d 1026, 1030–31; *State ex rel. Okl. Bar Ass'n v. Colston,* 1989 OK 74, ¶ 21, 777 P.2d 920, 925–26; *Raskin, supra* note 9 at ¶ 22, at 268.

**48.** See e.g., *State ex rel. Okl. Bar Ass'n v. Gasaway,* 1991 OK 33, ¶ 10, 810 P.2d 826, 831 (commingling of client funds, using client monies for purposes other than those authorized, and failure to make a full and fair disclosure to the Bar concerning the grievance warranted a one-year suspension); *State ex rel. Okl. Bar Ass'n v. Miskovsky,* 1990 OK 12, 804 P.2d 434 (attorney's failure to return cash entrusted to him by a client upon the latter's request would be deemed con-

¶ 36 Respondent's license to practice law is accordingly suspended for thirty days from the effective day of this pronouncement and he shall pay the costs of this proceeding—in the sum of $474.89—not later than ninety days after this opinion becomes final.

¶ 37 SUMMERS, C.J., LAVENDER, OPALA, BOUDREAU, and WINCHESTER, JJ., concur;

¶ 38 HARGRAVE, V.C.J., and HODGES, J., concur in part and dissent in part;

¶ 39 KAUGER, J., concurs in result;

¶ 40 WATT, J., dissents.

HODGES, J., with whom HARGRAVE, V.C.J., joins, concurring in part and dissenting in part.

¶ 1 I would adopt public reprimand—the measure recommended by the Professional Responsibility Tribunal—as the discipline to be imposed upon the respondent.

WATT, J., dissenting.

¶ 1 I would impose a longer period of suspension.

---

version and warranted a three-month suspension); *State ex rel. Okl. Bar Ass'n. v. Moss*, 1990 OK 22, ¶ 36, 794 P.2d 403, 411 (the improper use of a client's money and failure to preserve another client's money in an identifiable separate account warranted a two-year and one-day suspension); *State ex rel. Okl. Bar Ass'n. v. Brown*, 1989 OK 75, ¶ 10, 773 P.2d 751, 753 (falsely endorsing check payable to a client, failing promptly to notify a client of receipt of funds, affirmatively misleading a client concerning distribution of funds, and lying under oath during deposition, warrant a six-month suspension, even though the attorney has practiced law for 15 years and had had no other disciplinary complaints); *State ex rel. Okl. Bar Ass'n. v. Geb*, 1972 OK 17, ¶ 14, 494 P.2d 299, 301–02 (commingling of client funds and failing promptly to remit funds belonging to a client warrants a twelve-month suspension).