OSCN Found Document:STATE ex rel. OKLAHOMA BAR ASSOCIATION v. HELTON

 
 
 

 
 
 
 
 
 
 
 

 


 
 
 
 
 
 


 
 OSCN navigation


 
 
 Home

 
 Courts

 
 
 Court Dockets
 

 
 Legal Research

 
 Calendar

 
 Help
 
 







 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 
 
 

 
 
 
 STATE ex rel. OKLAHOMA BAR ASSOCIATION v. HELTON
2017 OK 31
394 P.3d 227
Case Number: SCBD-6326
Decided: 04/18/2017
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2017 OK 31, 394 P.3d 227

 

STATE OF OKLAHOMA ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,
v.
SCOTT ROBERT HELTON, Respondent.

ATTORNEY DISCIPLINARY PROCEEDING

¶0 The Oklahoma Bar Association filed a Complaint against Scott Robert Helton. It alleged multiple violations of the Oklahoma Rules of Professional Conduct, 5 O.S. 2011, Ch. 1, App. 3-A, and the Rules Governing Disciplinary Proceedings, 5 O.S. 2011, Ch. 1, App. 1-A, concerning his representation of an elderly client with whom he developed a close, familial, personal relationship. The Professional Responsibility Tribunal recommended a public reprimand. Upon de novo review, we agree.

RESPONDENT IS PUBLICLY REPRIMANDED; 
NO COSTS IMPOSED.

Tommy Humphries, Assistant General Counsel, Oklahoma Bar Association, Oklahoma City, Oklahoma, for Complainant.
Charles F. Alden, III, Oklahoma City, Oklahoma, for Respondent.

KAUGER, J.:

¶1 This matter comes before the Court pursuant to Rule 6 of the Rules Governing Disciplinary Proceedings (RGDP), 5 O.S. 2011, Ch. 1, App. 1-A.[1]

On November 19, 2015, the Oklahoma Bar Association (Bar) filed its complaint against Respondent, Scott Robert Helton (respondent/attorney/Helton), alleging one count of misconduct in violation of several of the Oklahoma Rules of Professional Conduct (ORPC), 5 O.S. 2011, Ch. 1, App. 3-A, and the RGDP, 5 O.S. 2011, Ch. 1, App. 1-A. This complaint is the result of an investigation begun by the Bar after it received an anonymous letter critical of Helton's, four-year non-genetic, relationship with a 91 year-old client, Lonnie Brooks (Brooks).[2]

¶2 On May 10 and 11, 2016, the Professional Responsibility Tribunal (PRT) held a hearing on the Bar's allegations against Helton. Respondent, with counsel, appeared at the hearing. The PRT took testimony from several witnesses, including Helton and Brooks (by deposition). The PRT also admitted a multitude of exhibits, many subject to a protective order and filed under seal. Other than the anonymous complaint filer, there were no unfavorable witnesses.

¶3 The PRT filed its Trial Panel Report with this Court on July 13, 2016. Based on what it considered to be the unusual circumstances of this matter, the PRT recommended respondent receive a public reprimand. The Bar recommends Helton be suspended from the practice of law for a minimum of six months, and be assessed costs in the amount of $4,439.47. After de novo review[3] We agree with the PRT, but decline to impose costs.[4]

THE GRIEVANCE AND EVIDENCE

¶4 The Bar asserts Helton violated Rules 1.1 [competence],[5] 1.3[diligence],[6] 1.4[keep client informed][7] , 1.5[fees],[8] 1.8(a) & (c) [business transactions],[9] and 1.15[client property], ORPC,[10] 5 O.S. 2011, Ch. 1, App. 3-A, and Rule 1.3 [discredit] RGDP,[11] 5 O.S. 2011, Ch. 1, App. 1-A, based on respondent's relationship with Brooks, the gifts she gave him and his family, and his handling of various assets and transactions. On April 7, 2011, Brooks hired the respondent to probate the estate of her sister, Betty Groves. She was referred to Helton by someone she knew, and prior to the start of his representation of her during the probate matter, the two were unacquainted.

¶5 Helton and Brooks quickly developed a familial relationship that extended beyond the typical attorney-client relationship. Brooks' husband died in 1987, and she lived alone, rarely leaving her home. With the death of her sister, Brooks lacked any relatives with whom she had close contact. Brooks originally had a will leaving her estate to her sister Betty Groves. After her sister's death, Brooks began discussing changing her will and updating her estate planning with respondent.

¶6 Over the course of the next few years, the respondent helped Brooks execute a will, prepare a will naming him as personal representative of the estate, prepare a Durable Power of Attorney and Advance Directive for Health Care, and name him as the beneficiary of an annuity Brooks possessed, in place of her deceased sister. Brooks also gifted Helton with money and other gifts.

¶7 Concerned about Brooks' desire to make him the beneficiary of the annuity, Helton contacted Attorney Charles Swartz (Swartz) to meet with Brooks and discuss the matter with her. Helton sought Swartz as independent counsel to review and execute the Beneficiary Change Request Brooks desired to make. Swartz, brought another person with him for the review and he did not find Brooks to be incompetent or under Helton's undue influence. Rather, quite the opposite.

¶8 Respondent, and his family, established their relationship with Brooks when they visited her in her home often. In the summer of 2012, Brooks fell while in her home and injured her back. She called respondent, who went to her home and called 911. Helton had her transported to Saint Francis Hospital. After a period in the hospital, Brooks was eventually transferred to a facility called Montereau for rehabilitation. She then returned home with full-time home healthcare arranged by respondent, but due to costs, she moved back into the assisted living wing of Montereau. Brooks was eventually transferred to the nursing home section of Montereau, which she was unhappy with, and with the attorney's help moved to a different facility called the Arbors, where she now lives and apparently loves.

¶9 In the process of caring for Brooks, Brooks directed the respondent precisely as to her wishes. On August 2, 2012, Brooks authorized Helton and his wife as joint account holders with rights of survivorship to Brooks' bank account at F&M Bank in order to enable the Heltons to pay Brooks' bills. By August 14, 2012, Helton and his wife had access and joint ownership of all cash assets belonging to Brooks. Sometime before September 8, 2012, Brooks informed Helton that she wanted to change her will to make him the beneficiary of her estate. Respondent again asked Swartz to contact Brooks and discuss the matter with her. Swartz again brought another person with him, and Helton was not involved in the discussion. Brooks executed a new will, prepared by Swartz, leaving her entire estate to Helton. On the same date, Brooks executed a transfer on death deed, also prepared by Swartz, which would transfer the title of her home to Respondent upon her death.

¶10 Respondent testified that once it became apparent Brooks was not going to be moving out of the Arbors and back home anytime soon, he discussed with her the possibility of renting her home in order to generate extra income for her. She agreed, and Brooks recommended placing the home into an LLC. for purposes of limiting her potential liability from renting her home. Accordingly, on March 13, 2013, Helton filed documents with the Oklahoma Secretary of State, that he had prepared, creating Lonnie Brooks Enterprises, LLC. and on March 27, 2013, Brooks executed a Warranty Deed prepared by Helton, which transferred the title of Brooks' home to Lonnie Brooks Enterprises, LLC.

¶11 On July 26, 2013, Helton filed documents with the Oklahoma Secretary of State that he prepared which created Helton Properties, LLC. As with the Lonnie Brooks Enterprises, LLC., no documents were created indicating who owned and who managed Helton Properties, LLC. According to Helton, he and his wife are the sole owners of Helton Properties, LLC., and he is the manager.

¶12 Because rental of Brooks' home was going well, the attorney suggested liquidating the annuity (worth roughly $200,000) of which he was the beneficiary, and buying two additional rental properties. He cashed the annuities owned by Brooks and caused two additional rental properties to be purchased by Helton Properties, LLC. According to Helton, he and Brooks had an agreement that he would manage the properties owned by Helton Properties, LLC. and pay himself one third of the rental payments for doing so, with the remainder being used for the benefit of Brooks. Brooks' deposition reveals she agreed to this arrangement, and was aware of the details. The attorney did not memorialize the agreement in writing, advise Brooks that she should have an independent counsel review the agreement, or obtain written informed consent from Brooks concerning the transaction.

¶13 At the May 10, 2016, PRT hearing, counsel for the Bar announced that Lonnie Brooks did not disagree with nor did she disavow the attorney's conduct. The Bar's opening statement summarizes the level of complaint that Brooks had regarding Helton, or rather, the level of complaint she lacked. It provides:

You're not going to hear --- you're not going to hear complaints from Lonnie Brooks. As we mentioned before we started, Lonnie Brooks will testify by deposition, but she's not upset with Scott Helton. She doesn't disagree with his actions. She's perfectly happy with everything he's done. I understand that makes my case hard, but it's for all those reasons and as you hear and read her testimony, it's the client like Mrs. Brooks that requires Mr. Helton to follow these rules to a T because he's the one that has to know these rules, protect her, because at some point she just decided to let him decide everything. That's why she's okay. She's okay with the gifts. You're going to hear about management fee reimbursements in their business partnership. She's okay with those, but you're also going to hear that she doesn't know a lot of level of detail about those things because she decided to let Mr. Helton decide everything.

You are not going to hear from me that Mr. Helton did everything wrong. I'm going to ask for your patience because I want to tell the whole story of their relationship, but Mr. Helton followed the rules and sought independent counsel in two circumstances.

In other words, Ms. Brooks wanted Helton to handle everything, and she got exactly what she wanted, but because she was elderly and did not want to be bothered with details, everyone else determined that she should not have been allowed to do what she wanted with her money. Disposing of one's property is a basic right of every citizen.[12]

¶14 The most telling evidence comes directly from Ms. Brooks herself. Her deposition testimony was taken on April 28, 2016, and entered into evidence during the PRT proceedings. She explained on direct examination that:

1. She and Helton had become good friends, and that he helped her and talk with her.
2. When she fell in June of 2012, she did not call 911, rather she called Helton for help and he called 911.
3. She loved Helton and his wife and kids and that "nobody could come close" and that they loved her too.
4. When she told Helton that she wanted to make him her beneficiary of her annuity, he did not want to do it and he referred her to another lawyer.
5. The other lawyer and a lady from his office visited with her about the annuity, they questioned her, explained what it meant to change a beneficiary and made certain that it was her intention and her decision, and hers alone, to make the change because she did not have anybody else to leave it to.
6. She considered Helton and his wife and kids her family. Helton has lunch with her once a week, his wife and kids visit her regularly, and they exchange Christmas presents and celebrate Christmas together.
7. She discussed everything with Helton, authorized him to rent her house, authorized him to convey to the Lonnie Brooks Company and Helton Properties and she did it to ensure that she had enough money for her care and medical care.
8. She authorized Helton and his wife to handle her money, pay her bills, and be on her accounts and that was exactly how she wanted things.
9. She agreed to have Helton purchase additional houses for additional income because of her fear that she might not have enough money for future medical care.
10. She was completely satisfied with the way her property was transferred and managed and Helton offered to put everything back to how it was before he did anything for her and she did not want him to do that.

¶15 Throughout her testimony she was lucid, direct, and factual. Not only was she in great mental shape, but it also appears she was very healthy, because she did not take any prescription medications. On cross examination she became very agitated asking or stating:

1. Do you have to go through that whole book?
2. Why do you want to know all this?
3. He [Helton] doesn't tell me what to do.
4. Well, I've got sense enough to do things by myself.
5. How much longer?
6. I just want to get it over with.
7. I thought you said you weren't going to go through the book.
8. You're asking questions a long time. . . . And I'm an old woman.
9. Why do you want to know all that?
10. Let's quit. I'm tired of the same questions.
11. Oh, my God. Such a question.

Clearly, Ms. Brooks was neither a willing participant nor a complainant. She appeared perfectly satisfied with what Helton had done for her and perfectly satisfied that her estate planning was set up exactly how she intended.

¶16 In a document dated July 11, 2014, which Ms. Brooks signed herself and had a witness sign, Helton reiterated, in writing, all of their transactions together, what he had done for her and whose names were on what holdings. He notified her that if she was unsure about any of their arrangements, she could meet with another lawyer at any time.

¶17 Also telling, and perhaps most convincing, comes from the testimony of the man who served as the administrator of the facility where Ms. Brooks lives. He was on hand, watching the daily interaction of Helton and Ms. Brooks. His thirty pages of testimony revealed the following:

1. He was both a licensed practical nurse as well as a licensed administrator for assisted living centers.
2. At least one of the Heltons visited Ms. Brooks almost everyday and brought their kids to see her.
3. The respondent would always bring in the mail to Ms. Brooks, go over it with her, sit down on a monthly basis and go over all of the information from her checking account, go over statements and "stuff like that."
4. He believed if it were not for the Heltons, Ms. Brooks would not be alive because they treated her like family and kept her from being lonely and made her happy.
5. The Heltons provided Ms. Brooks with anything and everything she needed.
6. He had personally met with Ms. Brooks alone to make sure she was not vulnerable or being taken advantage of and he was certain that everything Helton did was exactly as Ms. Brooks directed him.

¶18 Finally, the respondent testified and explained his actions. He said:

The explanation for this is my - in my mind, in December of '12 when her - well, whatever date her [sister's] probate ended, that was, in my mind, the last thing that I did for her as her attorney. I already knew her well. My family knew her well. We continued to take care of her, help her with doctors' visits, buy her clothes when she needed it, everything in my mind a family member would do for a grandmother. We were very close, and that developed over a period of time. I was trying to help her in doing this. I didn't think about whether or not I was acting as her attorney because in my mind, I was not. I didn't think about having Mr. Swartz or anyone else come back to meet with her because I didn't see it as a gift. To me, like the changing the will was or the annuity was, it didn't - it didn't cross my mind that she would need independent counsel for these transactions. I was trying to help and that's why I did this. I didn't charge her for Medicaid planning. I didn't prepare, you know, a new will or anything like that. You know, there's been some discussion about this --- you know, an estate plan for her. I didn't see it as that. I saw this as if my grandmother was in a similar situation, this is things that I had seen other people do for their family, and I had --- I had over time developed a relationship with her and my family that I prepared these documents not thinking about practicing law in doing it for her or acting as her attorney, or you know, hiring someone else to come in and consult with her on that.

¶19 What the respondent describes is exactly what the record reflects. He even offered to "undo" everything for her when the anonymous complaint was filed and she would not let him. Complainant asserts respondent violated the Rules based on his relationship with Ms. Brooks and his handling of various assets and transactions.

¶20 Helton has no previous disciplinary history. After the investigation began, he committed all of his agreements with Ms. Brooks to writing and she readily agreed. She maintained throughout that Helton was doing exactly what she wanted him to do. No one disputes that Ms. Brooks was competent and that she did not want to undo anything Helton did. It is unquestionable from the evidence that respondent and his family have developed a close personal relationship with Ms. Brooks and that they care for her and she cares for them and that respondent was attempting to provide for Ms. Brooks and her future care.

DISCIPLINE TO BE IMPOSED

¶21 The PRT determined that clear and convincing evidence shows that Helton violated several of the ORPC. Respondent appears to not contest some of these conclusions, noting in his Brief in Chief that the evidence supports the Trial Panel's conclusions regarding Rules 1.1., 1.3, 1.4, and 1.8(a).[13] Complainant agrees. It should be noted that Helton did not see himself as Brooks' legal counsel after the conclusion of the probate of her sister's estate. However, an attorney-client relationship can be established by a reasonable subjective belief of the client.[14]

¶22 Respondent took numerous legal actions in Brooks name and on her behalf and continued to provide estate planning and other services to Brooks throughout the time period at issue in this matter. He neglected to prepare an operating agreement for Lonnie Brooks Enterprises, LLC. indicating who owned or managed it. Helton received multiple and substantial cash gifts from Brooks and failed to document them in any way. He failed to document his business relationship with Brooks concerning Helton Properties, LLC. The attorney overpaid himself from Helton Properties, LLC., due to his failure to properly account for how much he was owed for the management of the rental properties, based on an unwritten agreement.

¶23 In the process of transferring Brooks' assets to himself and his wife, Brooks potentially exposed them to his own liabilities while he simultaneously undercut Brooks' will, which had been reviewed by independent counsel. In the end, Helton has transferred most of Brooks' assets to himself, inter vivos, with next to no independent review. While there is no evidence the attorney intentionally did this to avoid probate of Brooks' estate, as Complainant suggests, the sum total of his conduct at the very least, demonstrates a technical violation of Rules 1.1 and 1.3, ORPC.

¶24 Complainant also asserts Helton violated Rule 1.4, ORPC, 5 O.S. 2011, Ch. 1, App. 3-A, which requires prompt communication from attorneys to clients and requires clients be kept reasonably informed and give informed consent to matters related to the representation.[15] Respondent violated the provisions of Rule 1.4 by entering into a business transaction with Brooks (Helton Properties, LLC.), where he did not reduce the terms to writing, did not advise Brooks of the desirability of seeing independent counsel, and did not obtain Brooks' informed written consent as to the essential terms of the transaction, his role, and whether he was representing Brooks. Even though the evidence shows that Brooks was fully informed and acquiesced to the terms, clear and convincing evidence in the record supports a determination that the attorney technically failed to comply with the requirements of Rule 1.4, ORPC.

¶25 Complainant asserts that Helton violated Rule 1.5, ORPC, 5 O.S 2011, Ch. 1, App. 3-A, which concerns the propriety of attorney fees.[16] Complainant alleges Helton violated Rule 1.5 when he overpaid himself from the Helton Properties, LLC., bank account. The PRT did not make a specific finding concerning Rule 1.5. Given the evidence in the record, Helton's agreement to take a management fee in exchange for managing investment properties on behalf of Brooks is not a traditional fee arrangement for legal services but rather part of a business agreement between Helton and Brooks because he was essentially making investments on her behalf.[17] Rule 1.5 is inapplicable to the corresponding facts, and clear and convincing evidence does not exist in the record to support Complainant's allegations.

¶26 Complainant also asserts that the attorney violated Rule 1.8(a) and (c), ORPC, 5 O.S 2011, Ch. 1, App. 3-A, concerning business transactions with clients and solicitation of gifts.[18] The PRT found clear and convincing evidence in the record that he violated Rule 1.8(a), and we agree. By forming Helton Properties, LLC., amassing rental properties, and managing them on Brooks' behalf, Helton entered into a business transaction with Brooks. He did so without: 1) fully disclosing the terms of the transaction in writing; 2) advising Brooks in writing about the desirability of obtaining independent counsel; and 3) obtaining written informed consent in a reasonable amount of time from Brooks.

¶27 Complainant also asserts that Helton violated Rule 1.8(c) by preparing and executing a deed that transferred title to Brooks' home (worth approximately $100,000) from Lonnie Brooks Enterprises, LLC. to Helton Properties, LLC. Per Helton's testimony, Brooks was the owner of the former and Helton owner of the latter. The attorney argues that no violation of Rule 1.8(c) occurred. He asserts there is no evidence in the record that he solicited the transfer as a gift to himself, and no evidence that Brooks intended the conveyance to make a gift to Helton, or that he accepted it as such. We agree with respondent.

¶28 Rule 1.8(c), ORPC, 5 O.S. 2011, Ch. 1, App. 3-A, does not set out in detail the requirements for a conveyance to be deemed a "gift" under its terms.[19] Though the attorney effectively took legal title to Brooks' home when it was transferred to Helton Properties, LLC. (along with other assets of Brooks), the record does not contain evidence of either donative intent on the part of Brooks or acceptance of a gift by the attorney. Rather, the evidence in the record suggests that the property was transferred, with Brooks approval, to Helton Properties, LLC, to be held on her behalf in order to generate income for her. Regardless of the wisdom of that decision or the fact that Brooks' goals might have been accomplished using a trust or some other means, there is no evidence that this transfer was meant as a gift to the attorney.

¶29 Complainant also alleges Helton violated Rule 1.15(a), ORPC, 5 O.S. 2011, Ch. 1, App. 3-A[20] , by overpaying himself from the funds in the bank account belonging to Helton Properties, LLC., because those funds were supposed to be held for the benefit of Brooks. Respondent argues because there is no evidence that he acted intentionally with regards to the overpayment, and no evidence of harm to Brooks, he did not commit simple conversion. Intent is a required element of the third level of culpability, misappropriation, which occurs when an attorney has purposefully deprived a client of money through deceit and fraud or when a lawyer has intentionally inflicted grave economic harm in mishandling clients' funds.[21]

¶30 Intent is not, however, necessary to prove simple conversion.[22] In State ex. rel. Oka. Bar Ass'n v. Combs, 2007 OK 65, ¶¶10 & 17, for example, this Court determined an attorney committed commingling and simple conversion when he settled a wrongful death suit and deposited the settlement proceeds into his trust account, and then, because of a miscommunication with his staff, inadvertently deposited almost the entire settlement amount into his operating account and used the money for personal expenses. Accordingly, this Court finds Complainant has proven by clear and convincing evidence that Respondent committed simple conversion in violation of Rule 1.15, ORPC, when he overpaid himself from the Helton Properties, LLC., account by writing various checks to contractors for the construction of his home.

¶31 Complainant also alleges that, by committing the actions detailed above, Respondent has violated Rule 8.4(a), ORPC, 5 O.S. 2011, Ch. 1, App. 3-A[23] , as well as Rule 1.3, RGDP, 5 O.S. 2011, Ch. 1, App. 1-A.[24] Clear and convincing evidence in the record supports a determination that Respondent violated Rule 8.4(a), ORPC, by committing violations of the Oklahoma Rules of Professional Conduct, and violated Rule 1.3, RGDP by committing acts contrary to prescribed standards of conduct which bring discredit upon the legal profession. While the attorney may not have had any ill intent, his multiple rule violations and general carelessness during his representation of an elderly client reflect poorly on the legal profession.

¶32 In disciplinary proceedings, the responsibility of this Court is not to punish, but instead to inquire into and gauge a lawyer's continued fitness to practice law, with a view to safeguarding the interest of the public, of the courts, and of the legal profession.[25] Discipline should always be administered fairly (i.e. evenhandedly), but this Court recognizes that the extent of discipline must be decided on a case-by-case basis because each situation will usually involve different transgressions and different mitigating circumstances.[26] To arrive at appropriate discipline, one fit factor to consider is the deterrent effect upon both the offending respondent and other attorneys who might contemplate similar conduct in the future.[27] Other factors properly considered include comparing the circumstances in the matter at hand with previous disciplinary matters, and examining an attorney's past record of professional behavior.[28] Mitigating circumstances may also be considered in gauging the proper measure of discipline.[29]

CONCLUSION

¶33 The Court recognizes the circumstances of this cause are very unusual. The respondent has no previous disciplinary history and after the Bar began communicating with him, he committed all of his agreements with Brooks to writing. Brooks continually expressed that Helton was doing exactly what she wanted him to do. Upon discovering the extent of his overpayment to himself from the Helton Properties, LLC., account, he ceased payments to himself for managing the properties and has since made up the difference. It is unquestionable from the evidence that Respondent and his family have developed a close personal, familial, relationship with Brooks and that they care for her and she cares for them. Helton was merely attempting to provide for Brooks and her future care. Brooks benefited from Helton's representation and Helton has fully complied with every aspect of the disciplinary process in this matter.

¶34 Complainant argues Respondent should be suspended from the practice of law for a minimum of six (6) months and be assessed the costs of these proceedings. The PRT recommends that Respondent receive a public reprimand, given the unusual facts and mitigating circumstances of this cause. Given the nature of the technical rule violations and the evidence in favor of mitigation, it is the determination of this Court that Respondent shall be publicly reprimanded, but not ordered to pay costs in the amount of $4,439.47.

RESPONDENT IS PUBLICLY REPRIMANDED; 
NO COSTS IMPOSED.

GURICH, V.C.J., KAUGER, WATT, and EDMONDSON, JJ., ; BUETTNER, S.J., concur.

COMBS, C.J., (by separate writing), WINCHESTER, COLBERT AND WYRICK (by separate writing), JJ., dissent.

REIF., J., not participating.

FOOTNOTES

[1] Title 5 O.S. 2011 Ch. 1, App.1-A, RGDP, Rule 6.1 provides:

Formal proceedings in matters involving misconduct by lawyers shall be brought by direction of the Professional Responsibility Commission.

The proceeding shall be initiated by a formal complaint prepared by the General Counsel, approved by the Commission, signed by the chairman or vice-chairman of the Commission, and filed with the Chief Justice of the Supreme Court. Upon the expiration of the respondent's time to answer, the complaint and the answer, if any, shall thereupon be lodged with the Clerk of the Supreme Court and the complaint, as well as all further filings and proceedings with respect thereto, shall be a matter of public record. Nine copies shall be filed with each original instrument.

[2] The Bar publishes on its website, www.okbar.org, general information about the lawyer complaint process. In it, the Bar warns that "[b]y law, any grievance you want to make against an attorney must be in writing and must be signed." At the bottom of page three of the grievance form, the Bar again warns that "[t]his grievance form must be signed before it can be considered." The above requirements are made so that grievances comply with Rule 5 of the Rules Governing Disciplinary Proceedings (RGDP), 5 O.S. 2011, Ch. 1, App. 1-A which provides in pertinent part:

(a) Each grievance or request for investigation (grievances and requests for investigation both being hereinafter referred to as a "grievance") involving a lawyer or involving the unauthorized practice of law, shall be in writing and signed by the person filing the same, except that the General Counsel or the Commission may, in their discretion, institute an investigation on the basis of facts or allegations involving a lawyer or the unauthorized practice of law brought to their attention in any manner whatsoever. A lawyer or any other person will be immediately notified of the receipt of a grievance and furnished a copy thereof.

[3] State ex rel. Okla. Bar Ass'n v. Boone, 2016 OK 13, ¶2, 367 P.3d 509; State ex rel. Okla. Bar Ass'n v. Conrady, 2012 OK 29, ¶6, 275 P.3d 133; State ex rel. Okla. Bar Ass'n v. Wilcox, 2009 OK 81, ¶2, 227 P.3d 642.

[4] The factual and legal determinations of the PRT are not binding on this Court, and any recommendations are merely advisory. State ex rel. Okla. Bar Ass'n v. Boone, see note 6, supra at ¶3; State ex rel. Okla. Bar Ass'n v. Trenary, 2016 OK 8, ¶6, 368 P.3d 801; State ex rel. Okla. Bar Ass'n v. Conrady, see note 6, supra. We ensure that the Bar has established charges of misconduct by clear and convincing evidence. State ex rel. Okla. Bar Ass'n v. Mirando, 2016 OK 72, ¶3, 376 P.3d 232; State ex rel. Okla. Bar Ass'n v. Boone, see note 6, supra at ¶3; State ex rel. Okla. Bar Ass'n v. Trenary, see note 7, supra.

[5] Rule 1.1, 5 O.S. 2011 Ch. 1, App. 3-A, ORPC provides:

A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation.

[6] Rule 1.3, 5 O.S. 2011 Ch. 1, App. 3-A, ORPC provides:

A lawyer shall act with reasonable diligence and promptness in representing a client.

[7] Rule 1.4, 5 O.S. 2011 Ch. 1, App. 3-A, ORPC provides:

a) A lawyer shall:

(1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(e), is required by these Rules; (2) reasonably consult with the client about the means by which the client's objectives are to be accomplished;
(3) keep the client reasonably informed about the status of the matter;
(4) promptly comply with reasonable requests for information; and
(5) consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Rules of Professional conduct or other law.
(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

[8] Rule 1.15, 5 O.S. 2011 Ch. 1, App. 3-A, ORPC provides in pertinent part:

(a) A lawyer shall not make an agreement for, charge or collect an unreasonable fee or an unreasonable amount for expenses. . . .
(b) The scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation, except when the lawyer will charge a regularly represented client on the same basis or rate. Any changes in the basis or rate of the fee or expenses shall also be communicated to the client.
(c) A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by paragraph (d) or other law. A contingent fee agreement shall be in writing signed by the client and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal; litigation and other expenses to be deducted from the recovery; and whether such expenses are to be deducted before or after the contingent fee is calculated. The agreement must clearly notify the client of any expenses for which the client will be liable whether or not the client is the prevailing party. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter, and, if there is a recovery, showing the remittance to the client and the method of determination. . . .

[9] Rule 1.8, 5 O.S. 2011 Ch. 1, App. 3-A, ORPC provides in pertinent part:

(a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:
(1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner that can be reasonably understood by the client;
(2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction; and
(3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction. . . .
(c) A lawyer shall not solicit any substantial gift from a client, including a testamentary gift, for the lawyer or a person related to the lawyer. Nor shall the lawyer prepare on behalf of a client an instrument giving the lawyer or a person related to the lawyer any substantial gift unless the lawyer or other recipient of the gift is related to the client. For purposes of this paragraph, related persons include a spouse, child, grandchild, parent, grandparent or other relative. . . .

[10] Rule 1.5, 5 O.S. 2011 Ch. 1, App. 3-A, Oklahoma Rules of Professional Conduct provides in pertinent part:

(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained in the state where the lawyer's office is situated, or elsewhere with the written consent of the client or third person. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.
(b) A lawyer may deposit the lawyer's own funds in a client trust account for the sole purpose of paying bank service charges on that account but only in an amount necessary for that purpose.
(c) A lawyer shall deposit into a client trust account legal fees and expenses that have been paid in advance, to be withdrawn by the lawyer only as fees are earned or expenses incurred.
(d) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.
(e) When in connection with a representation, a lawyer possesses funds or other property in which both the lawyer and another person claim interests, the funds or other property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved, and the undisputed portion of the funds shall be promptly distributed.
(f) Where funds or other items of property entrusted to a lawyer have been impressed with a specific purpose as to their use, they shall retain that specific character unless otherwise authorized by a client or third person or prohibited by law. Where funds are impressed with a specific purpose, a lawyer may not subject them to a counterclaim, set off for fees, or subject them to a lien. . . .

[11] Rule 1.3, 5 O.S. 2011 Ch. 1, App. 1-A, Oklahoma Rules Governing Disciplinary Proceedings provides:

The commission by any lawyer of any act contrary to prescribed standards of conduct, whether in the course of his professional capacity, or otherwise, which act would reasonably be found to bring discredit upon the legal profession, shall be grounds for disciplinary action, whether or not the act is a felony or misdemeanor, or a crime at all. Conviction in a criminal proceeding is not a condition precedent to the imposition of discipline.

[12] Disposing of property is an inalienable natural right throughout a person's lifetime. In re Estate of Jackson. 2008 OK 83, ¶15, 194 P.3d 1269; Snodgrass v. Snodgrass, 1924 OK 597, ¶10, 231 P. 237. Disposition of property after death and the right to inheritance are protected by statute. In re Estate of Jackson, supra.

[13] Rule 1.1, ORPC, 5 O.S. 2011, Ch. 1, App. 3-A, see note 9, supra; Rule 1.3, ORPC, 5 O.S. 2011, Ch. 1, App. 3-A, see note 11, supra; Rule 1.4, ORPC, 5 O.S. 2011, Ch. 1, App. 3-A, see note 7, supra; Rule 1.8, ORPC, 5 O.S. 2011, Ch. 1, App. 3-A, see note 9, supra. Both Rule 1.1. and 1.4 were amended effective September 19, 2016, after this cause commenced.

[14] State ex rel. Okla. Bar Ass'n v. Rouse, 1998 OK 56, ¶9, 961 P.2d 204. Even though the attorney-client relationship rests on contract, it is not necessary the contract be express or that a retainer be requested or paid. The contract may be implied from the conduct of the parties State ex rel. Okla. Bar Ass'n v. Green, 1997 OK 39, ¶19, 936 P.2d 947.

[15] Rule 1.4, ORPC, 5 O.S. 2011, Ch. 1, App. 3-A, see note 7, supra.

[16] Rule 1.5, ORPC, 5 O.S 2011, Ch. 1, App. 3-A, see note 10, supra.

[17] See Rule 1.8, Comments, ORPC, 5 O.S. 2011, Ch. 1, App. 3-A.

[18] Rule 1.8, 5 O.S. 2011, Ch. 1, App. 3-A, see note 9, supra.

[19] The general requirements for a gift of realty are illustrative. Gifts of realty are governed by the principles of personal property law. An essential element of a gift is the donor's intent to gratuitously pass the title to donee. Larman v. Larman, 1999 OK 83, ¶8, 991 P.2d 536; See In re Estate of Estes, 1999 OK 59, ¶29, 983 P.2d 438; Davis v. Nat'l Bank of Tulsa, 1960 OK 151, ¶17, 353 P.2d 482.

[20] Rule 1.15, ORPC, 5 O.S. 2011, Ch. 1, App. 3-A, see note 8, supra.

[21] State ex rel. Okla. Bar Ass'n v. Combs, 2007 OK 65, ¶16, 175 P.3d 340; State ex rel. Okla. Bar Ass'n v. Johnson, 1993 OK 91, ¶25, 863 P.2d 1136.

[22] See, State ex rel Okla. Bar Ass'n v. Mansfield, 2015 OK 22, ¶29, 350 P.3d 108; State ex rel. Okla. Bar Ass'n v. Combs 2007 OK 65, ¶¶10 & 17; State ex rel. Okla. Bar Ass'n v. Parsons, 2002 OK 72, ¶14-16, 57 P.3d 865

[23] Rule 8.4(a), ORPC, 5 O.S. 2011, Ch. 1, App. 3-A, provides in pertinent part:

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another.

[24] Rule 1.3, RGDP, 5 O.S. 2011, Ch. 1, App. 1-A, provides:

The commission by any lawyer of any act contrary to prescribed standards of conduct, whether in the course of his professional capacity, or otherwise, which act would reasonably be found to bring discredit upon the legal profession, shall be grounds for disciplinary action, whether or not the act is a felony or misdemeanor, or a crime at all. Conviction in a criminal proceeding is not a condition precedent to the imposition of discipline.

[25] State ex rel. Okla Bar Ass'n v. Boone, 2016 OK 13, ¶18, 367 P.3d 509; State ex rel. Okla. Bar Ass'n v. Friesen, 2015 OK 34, ¶18, 350 P.3d 1269; State ex rel. Okla. Bar Ass'n v. Layton, 2014 OK 21, ¶34, 324 P.3d 1244.

[26] State ex rel Okla. Bar Ass'n. Boone, see note 25, supra; State ex rel. Okla. Bar Ass'n v. Wintory, 2015 OK 25, ¶15, 350 P.3d 131; State ex rel. Okla. Bar Ass'n v. Wilcox, 2014 OK 1, ¶54, 318 P.3d 1114.

[27] State ex rel Okla. Bar Ass'n. Boone, see note 25, supra at ¶19, State ex rel. Okla. Bar Ass'n v. Doris, 1999 OK 94, ¶37, 991 P.2d 1015; State ex rel. Okla. Bar Ass'n v. McMillian, 1989 OK 16, ¶24, 770 P.2d 892.

[28] State ex rel Okla. Bar Ass'n. Boone, see note 25, supra at ¶19; State ex rel. Okla. Bar Ass'n v. Taylor, 2003 OK 56, ¶22; State ex rel. Okla. Bar Ass'n v. Doris, see note 31, supra. 

[29] State ex rel Okla. Bar Ass'n. Boone, see note 25, supra at ¶19; State ex rel. Okla. Bar Ass'n v. Taylor, see note 28, supra; State ex rel. Okla. Bar Ass'n v. Thomas, 1995 OK 145, ¶17, 911 P.2d 907.

 

 

COMBS, C.J., with whom WINCHESTER and COLBERT, JJ., join, dissenting:

¶1 The purpose of attorney disciplinary proceedings is to protect the public and the integrity of the legal profession. State ex rel. Okla. Bar Ass'n v. Friesen, 2016 OK 109, ¶8, 384 P.3d 1129; State ex rel. Okla. Bar Ass'n v. Mirando, 2016 OK 72, ¶3, 376 P.3d 232; State ex rel. Okla. Bar Ass'n v. Gassaway, 2008 OK 60, ¶3, 196 P.3d 495. The Court also aims for consistency in the imposition of discipline. State ex rel. Okla. Bar Ass'n v. Kinsey, 2009 OK 31, ¶13, 212 P.3d 1186; State ex rel. Okla. Bar Ass'n v. Groshon, 2003 OK 112, ¶6, 82 P.3d 99. Today's decision fails to comport with both goals and is not in keeping with this Court's precedent concerning attorney disciplinary proceedings. I therefore respectfully dissent.

I.
A SIGNED GRIEVANCE IS NOT REQUIRED FOR THE OBA TO
INVESTIGATE ALLEGED ATTORNEY MISCONDUCT OR FOR 
DISCIPLINARY PROCEEDINGS TO MOVE FORWARD.

¶2 First, the majority incorrectly implies a written and signed grievance is a necessary prerequisite to any investigation into alleged attorney misconduct. That position is not in accord with the RGDP and not in accord with this Court's precedent. In footnote 2, the majority opinion limits the extent of Rule 5.1 of the Rules Governing Disciplinary Proceedings (RGDP), 5 O.S. 2011, Ch. 1, App. 1-A, by ignoring specific and important language in the rule. It is the second portion of Rule 5.1(a) which applies to this cause:

(a) Each grievance or request for investigation (grievances and requests for investigation both being hereinafter referred to as a "grievance") involving a lawyer or involving the unauthorized practice of law, shall be in writing and signed by the person filing the same, except that the General Counsel or the Commission may, in their discretion, institute an investigation on the basis of facts or allegations involving a lawyer or the unauthorized practice of law brought to their attention in any manner whatsoever. A lawyer or any other person will be immediately notified of the receipt of a grievance and furnished a copy thereof. (Emphasis added).

Rule 5.1 gives the OBA discretionary authority to investigate allegations against an attorney brought to their attention "in any manner whatsoever." The overarching goal of protecting the public and the integrity of the legal profession is best served when the OBA is able to investigate legitimate concerns about an attorney's conduct regardless of the manner in which those concerns are brought to their attention.

II.
A PUBLIC CENSURE IS INSUFFICIENT DISCIPLINE GIVEN THE
SERIOUSNESS AND EXTENT OF RESPONDENT'S MISCONDUCT,
REGARDLESS OF BROOKS' SATISFACTION AND OTHER ALLEGED
MITIGATING FACTORS.

¶3 The concerns raised in the letter sent to the OBA were legitimate. The majority opinion finds clear and convincing evidence in the record that Respondent violated Rules 1.1,1.3,1.4, 1.8, 1.15, and 8.4, ORPC, 5 O.S. 2011, Ch. 1, App. 3-A, as well as Rule 1.3, RGDP. In other words, this Court finds Respondent committed almost all of the rule violations alleged by the Complainant. However, the majority opinion takes a "no harm, no foul" approach to attorney discipline, relying on Brooks' overall satisfaction with Respondent's conduct to justify both no discipline beyond a public censure as well as its refusal to award costs.[1]

¶4 Since the goal of attorney disciplinary proceedings is to protect the public and the integrity of the legal profession, lack of a grievance from a client and the client's overall satisfaction with an attorney's actions do not excuse multiple violations of the rules of the ORPC when those violations are brought to the attention of the OBA. Brooks' overall satisfaction with Respondent's conduct and failure to complain is without legal significance. In State ex rel. Okla. Bar Ass'n v. Taylor, 2000 OK 35, ¶29, 4 P.3d 1242, this Court stated:

 

While the client did not join in the complaint by pressing for respondent's discipline, that aspect is without legal significance. Disciplinary judicature protects the public against lawyers whose professional misbehavior presents a risk to the served community as a whole-not just to individual clients or other complainants with standing as aggrieved persons.

Additionally, what the majority refers to as "technical violations" of the rules include acts such as the conversion of client funds. As this Court also stated in Taylor:

The attorney has exclusive domain over the management of entrusted funds. Keeping a client's (or third party's) money separate and distinct ensures that the money is at all times properly accounted for and can be shown to be distinct. This serves to prevent a lawyer from deliberately or mistakenly using any of the entrusted funds. "In their daily work lawyers commonly come into clients' funds. The trust placed in the lawyer owes its origin to the special professional status he occupies as a licensed practitioner. Public confidence in the practitioner is essential to the proper functioning of the profession. Few breaches of ethics are as serious as the act of commingling a client's [or third party's] funds and the unwarranted use of his money."

2000 OK 35, n.26, 4 P.3d 1242 (emphasis added) (quoting State ex rel. Okla. Bar Ass'n v. Raskin, 1982 OK 39, ¶14, 642 P.2d 262).

¶5 As the majority notes: Respondent's "multiple rule violations and general carelessness during his representation of an elderly client reflect poorly on the legal profession." Opinion of the Majority, ¶41. Respondent's rule violations and general conduct compel one conclusion: Respondent should have referred Brooks to independent outside counsel, both to prevent violations of the ORPC as well as to ensure she obtained competent representation to deal with her complex estate planning and care needs. Respondent potentially opened up Brooks' property to his own liabilities.

¶6 There are indeed mitigating circumstances in this cause, but the appropriate discipline is more than a mere public reprimand. For some of the violations committed by Respondent, even in isolation, this Court typically imposes suspension for various periods. For example, this Court commonly imposes suspension for simple conversion of client funds, with the length dependent on the surrounding circumstances. In State ex rel. Okla. Bar Ass'n v. Mansfield, 2015 OK 22, ¶29, 350 P.3d 108, this Court suspended an attorney for eighteen months for commingling funds and committing simple conversion in violation of Rule 1.15, ORPC, when he overpaid himself fees and promptly used the money for personal expenses. However, that penalty was imposed in part because the attorney in question attempted to cover up his actions and in the process violated Rules 3.3 and 8.4, ORPC. By way of contrast, in another case involving simple conversion by error, State ex rel. Okla. Bar Ass'n v. Combs, 2007 OK 65, ¶37, 176 P.3d 340, this Court suspended an attorney for ninety days after determining the bar failed to demonstrate the attorney acted intentionally to defraud or deceive, and failed to show any harm to the client. Other examples include State ex rel. Okla. Bar Ass'n v. Parsons, 2002 OK 72, 57 P.3d 865 and State ex rel. Okla. Bar Ass'n v. Cummings, 1993 OK 127, 863 P.2d 1164, where this Court imposed suspensions of one year on attorneys for commingling and simple conversion of funds.

¶7 In another example, State ex rel. Okla. Bar Ass'n v. Clausing, 2009 OK 74, 224 P.3d 1268, this Court suspended an attorney for one year for violations of Rules 1.1., 1.7, and 1.8, ORPC, and Rule 1.3, RGDP. The attorney in question violated his fiduciary duty as a trustee by using trust funds for his own personal use without consent and placing trust funds in jeopardy by transactions that were never put in writing. Clausing, 2009 OK 74, ¶26. We characterized those actions as very serious offenses. Clausing, 2009 OK 74, ¶26.

¶8 The majority stresses that Respondent, upon discovering his conversion of funds, ceased payments to himself for managing Brooks' properties and made up the difference. However, this Court has previously stated that the ability and willingness to make restitution for one's wrongdoing is not appropriate for consideration as a mitigating factor:

Judicial consideration of restitution as a mitigating factor in disciplinary proceedings is apt to create the impression that sanctions are proportioned in accordance with one's ability to pay, rather than gauged against the seriousness of one's misconduct. According significance to restitution leads to an obvious and substantial possibility of unjust discrimination. The mere circumstance of restitution is likely to be fortuitous and to depend upon conditions and circumstances that afford no reliable test of a person's moral fitness as a lawyer. Restitution may compensate an individual complainant for the financial loss suffered; conceivably, it may partially restore the shattered faith of a particular client. It does not significantly retard the subtle, but progressive, erosion of public confidence in the integrity of the bench and bar. Encouraging restitution in individual cases is a worthy purpose, but the application of lenient discipline needed to achieve it conflicts with the paramount goal of preserving public confidence in the entire bar.

Raskin, 1982 OK 39, ¶19 (footnotes omitted).

CONCLUSION

¶9 The majority opinion is not in keeping with the overall purpose of attorney disciplinary proceedings, which is to protect the public and the integrity of the legal profession. To the extent that attorney misconduct is treated as a private dispute between the lawyer and his clients, the efforts of the legal profession to preserve its integrity and to protect the general public may be substantially undercut. Raskin, 1982 OK 39, n.10. Further, the majority opinion's substantial departure from precedent is manifestly not consistent with prior disciplinary proceedings, especially with regards to: 1) the mechanics of the disciplinary process; 2) the seriousness of Respondent's numerous rule violations; and 3) the weighing of supposed mitigating factors. Given the nature of Respondent's misconduct and the legitimacy of the OBA's investigation and prosecution of this matter, I would suspend Respondent for ninety (90) days and assess costs in the amount of $4,439.47.

FOOTNOTES

[1] The appropriateness of assessing costs in an attorney disciplinary proceeding hinges on whether the professional misconduct charges have been proven by clear and convincing evidence and whether the costs are related to a violation of a rule of professional conduct or disciplinary rule. State ex rel. Okla. Bar Ass'n v. McArthur, 2013 OK 73, ¶9, 318 P.3d 1095; State ex rel. Okla. Bar Ass'n v. Casey, 2012 OK 93, ¶34, 295 P.3d 1096; State ex rel. Okla. Bar Ass'n v. Albert, 2007 OK 31, ¶27 n.33, 163 P.3d 527. Both of those criteria have been met in this cause.

In this cause, the majority provides no justification for its failure to award any costs despite finding the Complainant proved by clear and convincing evidence that Respondent committed the vast majority of alleged violations. Presumably, the justifications are alleged mitigating factors and the supposedly "technical" nature of Respondent's rule violations. As noted above, neither factor is typically considered by this Court in making a determination concerning an award of costs.

 

 

Wyrick, J., dissenting:

¶1 During the course of his representation of an elderly client, Respondent Scott Robert Helton violated numerous rules of professional conduct, including Rules 1.1 (he was not competent), 1.3 (he was not diligent), 1.4 (he failed to adequately communicate), 1.8 (he had a conflict of interest), 1.15 (he did not safeguard his client's money), and 8.4 (he engaged in professional misconduct). For these violations, the Bar Association recommends that Helton's license be suspended for six months and he be forced to pay the costs of the investigation and prosecution of his misconduct. The majority is persuaded that a variety of mitigating circumstances counsel in favor of a lighter touch; it accordingly rejects the Bar Association's recommendation in favor of the public reprimand preferred by the Professional Responsibility Tribunal. Respectfully, I am not so persuaded, and would accept the Bar Association's recommendation.

¶2 As a starting point, the Bar Association recognized that the case involved "tremendous" mitigating factors,[1] and thus formulated a recommendation that accounted for those factors. Heeding our admonition that we strive "to impose equal or uniform discipline in order to avoid the vice of disparate treatment given to those being disciplined,"[2] the Bar Association looked to the most analogous case it could find,[3] our 2003 decision in State ex rel. Oklahoma Bar Association v. McLain,[4] and recommended discipline equal to that imposed there. I find this approach reasonable and disagree with the majority's decision to ascribe greater weight to the various mitigating factors in imposing significantly lighter discipline than that imposed in McLain.

¶3 First, the majority places weight on what they call Helton's mere "technical" violations of the Rules. By this, they mean that there is no evidence that Helton intentionally violated the rules and intentionally took advantage of his elderly client. But the relevant Rules contain no mens rea requirements and make no distinction between intentional and mere "technical" violations. The Rules are either violated, or they are not. This is so because the goal of attorney discipline is not retribution for the rules violation, in which case intent would be more relevant,[5] but rather "safeguarding the interests of the public, the courts and the legal profession as well as acting as a deterrent to future misconduct."[6] Because our goal is to impose discipline with an eye toward protecting the public from future violations, the fact that Helton committed his violations inadvertently rather than intentionally should be of little mitigating relevance. The intentional wrongdoer at least knows he is doing wrong and can choose to correct his course; the oblivious wrongdoer, on the other hand, enjoys the bliss of ignorance, unaware that any course correction is due. Appropriately so, a lack of mal-intent did not serve as a barrier to a lengthy suspension in McLain,[7] and the majority provides no rationale for why it creates such a barrier here. As I see it, had Helton intentionally violated the rules to take advantage of his elderly client, there would likely be nine votes for disbarment. Thus, even if Helton's lack of mal-intent is relevant and mitigating, that mitigation is adequately reflected in the Bar's recommendation of a six-month suspension instead of disbarment.

¶4 The majority next places significant weight on the client's satisfaction with Helton's services. While the lack of a complaining victim has some superficial appeal as a basis for mitigation, it again runs counter to the rationale undergirding lawyer discipline, which is to protect the public at large, and not necessarily the individual client in a particular case. That is why we recently disbarred an attorney who--at the request of her client--smuggled a cell phone into a jail.[8] That client was almost certainly pleased with the services rendered by his attorney, but no one on this Court found that fact remotely mitigating, and for good reason. That attorney's conduct violated rules designed to protect the public, and her conduct demonstrated that her continued practice of law placed the public at danger of further harm, notwithstanding her client's satisfaction with the services rendered. The same is no less true here.

¶5 The remaining "very unusual" circumstances relied on by the majority largely lack any mitigating qualities.[9] Helton's lack of prior disciplinary history certainly cuts in his favor, but the fact that he repaid his client the money he owed her and finally committed their agreements to writing after the Bar Association began to investigate him says nothing about the likelihood that he might repeat his mistakes in the future. Nor does the fact that he has a close familial relationship with this client tell us much about whether he might repeat his mistakes with a future client. If anything, it tells us that Helton will need to be particularly vigilant in the future to ensure that the lines between client and friend are not blurred as they were here.

¶6 I recognize that because of the judgment-laden nature of the task before us, reasonable minds will often reach different conclusions as to the discipline that is appropriate in any particular case. Thus, I do not fault the majority for reaching a conclusion different from mine. But because I would accept the Bar Association's recommendation, I must respectfully dissent.

FOOTNOTES

[1] Professional Responsibility Tribunal Hearing Tr. Vol. II at 354 (May 11, 2016) [hereinafter PRT Tr. II].

[2] State ex rel. Oklahoma Bar Ass'n v. Knight, 2015 OK 59, ¶ 33, 359 P.3d 1122, 1132.

[3] See PRT Tr. II at 362.

[4] 2003 OK 15, 65 P.3d 281.

[5] Cf. Enmund v. Florida, 458 U.S. 782, 800 (1982) (explaining that retribution as a justification for punishment "very much depends on the [defendant's] culpability--what [the defendant's] intentions, expectations, and actions were" and that "American criminal law has long considered a defendant's intention--and therefore his moral guilt--to be critical to the degree of his criminal culpability" (internal marks omitted)).

[6] McLain, 2003 OK 15, ¶ 26, 65 P.3d at 289; see also State ex rel. Oklahoma Bar Ass'n v. Boone, 2016 OK 13, ¶ 18, 367 P.3d 509, 515 ("In disciplinary proceedings, the responsibility of this Court is not to punish, but instead to inquire into and gauge a lawyer's continued fitness to practice law, with a view to safeguarding the interest of the public, of the courts, and of the legal profession."); State ex rel. Oklahoma Bar Ass'n v. Layton, 2014 OK 21, ¶ 34, 324 P.3d 1244, 1259.

[7] See 2003 OK 15, ¶¶ 24-25, 65 P.3d at 288 (imposing a six-month suspension and assessing costs against attorney with no prior disciplinary record who committed a technical violation of Rule 1.8 when she had her client sign a will on her deathbed bequeathing property to the attorney's mother and sister).

[8] State ex rel. Oklahoma Bar Ass'n v. Drummond, 2017 OK 24, --- P.3d ---.

[9] See Majority Op. ¶ 33.

 

 

 

 





 Citationizer© Summary of Documents Citing This Document
 
 
 Cite
 Name
 Level
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 Cite
 Name
 Level
 
 
 Oklahoma Supreme Court Cases
 Cite
Name
Level

 1989 OK 16, 770 P.2d 892, State ex rel. Oklahoma Bar Ass'n v. McMillian
Discussed
 1993 OK 91, 863 P.2d 1136, 64 OBJ 2082, State ex rel. Oklahoma Bar Ass'n v. Johnston
Discussed
 1993 OK 127, 863 P.2d 1164, 64 OBJ 2960, State ex rel. Oklahoma Bar Ass'n v. Cummings
Discussed
 1997 OK 39, 936 P.2d 947, 68 OBJ 1288, State ex rel. Oklahoma Bar Ass'n v. Green
Discussed
 1960 OK 151, 353 P.2d 482, DAVIS v. NATIONAL BANK OF TULSA
Discussed
 2002 OK 72, 57 P.3d 865, STATE ex. rel. OKLAHOMA BAR ASSN. v. PARSONS
Discussed at Length
 1995 OK 145, 911 P.2d 907, 66 OBJ 3991, State ex rel. Oklahoma Bar Assn. v. Thomas
Discussed
 2003 OK 56, 71 P.3d 18, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. TAYLOR
Cited
 2003 OK 15, 65 P.3d 281, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. McLAIN
Discussed at Length
 2003 OK 112, 82 P.3d 99, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. GROSHON, JR.
Discussed
 2007 OK 31, 163 P.3d 527, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. ALBERT
Discussed
 2007 OK 65, 175 P.3d 340, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. COMBS
Discussed at Length
 2008 OK 60, 196 P.3d 495, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. GASSAWAY
Discussed
 2008 OK 83, 194 P.3d 1269, IN THE MATTER OF THE ESTATE OF JACKSON
Discussed
 2009 OK 31, 212 P.3d 1186, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. KINSEY
Discussed
 2009 OK 74, 224 P.3d 1268, STATE ex rel OKLAHOMA BAR ASSOCIATION v. CLAUSING
Discussed at Length
 2009 OK 81, 227 P.3d 642, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. WILCOX
Discussed
 1924 OK 597, 231 P. 237, 107 Okla. 140, SNODGRASS v. SNODGRASS
Discussed
 2012 OK 29, 275 P.3d 133, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. CONRADY
Discussed
 2012 OK 93, 295 P.3d 1096, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. CASEY
Discussed
 2013 OK 73, 318 P.3d 1095, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. McARTHUR
Discussed
 2014 OK 1, 318 P.3d 1114, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. WILCOX
Discussed
 2014 OK 21, 324 P.3d 1244, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. LAYTON
Discussed at Length
 2015 OK 22, 350 P.3d 108, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. MANSFIELD
Discussed at Length
 2015 OK 25, 350 P.3d 131, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. WINTORY
Discussed
 2015 OK 34, 350 P.3d 1269, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. FRIESEN
Discussed
 2015 OK 59, 359 P.3d 1122, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. KNIGHT
Discussed
 2016 OK 8, 368 P.3d 801, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. TRENARY
Discussed
 2016 OK 13, 367 P.3d 509, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. BOONE
Discussed at Length
 2016 OK 72, 376 P.3d 232, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. MIRANDO
Discussed at Length
 2016 OK 109, 384 P.3d 1129, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. FRIESEN
Cited
 2017 OK 24, 393 P.3d 207, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. DRUMMOND
Cited
 1999 OK 94, 991 P.2d 1015, 70 OBJ 3622, State ex. rel. Oklahoma Bar Association v. Doris
Discussed
 2000 OK 35, 4 P.3d 1242, 71 OBJ 1163, State ex. rel. Oklahoma Bar Assn. v. Taylor
Discussed at Length
 1982 OK 39, 642 P.2d 262, State, ex rel., Oklahoma Bar Ass'n v. Raskin
Discussed at Length
 1998 OK 56, 961 P.2d 204, 69 OBJ 2123, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. ROUSE
Discussed
 1999 OK 59, 983 P.2d 438, 70 OBJ 1960, In the Matter of the Estate of Estes
Discussed
 1999 OK 83, 991 P.2d 536, 70 OBJ 3260, Larman v. Larman
Discussed